**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **MY24HOURNEWS.COM, INC.** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **V.** ) | **Case No.** |
| ) | |
| **AT&T CORP., VERIO, INC., NTT** ) | |
| **AMERICA, INC., ENUDURANCE** ) | |
| **INTERNATIONAL GROUP** ) | |
| **HOLDINGS, INC. and GENACOM,** ) | |
| **INC.** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**COMPLAINT FOR DAMAGES,**
**INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL**

Plaintiff My24HoursNews.Com, Inc. ("My24" or "Plaintiff"), for its Complaint for Damages, Injunctive Relief, and Demand for Jury Trial against AT&T Corp. ("AT&T"), Verio, Inc. ("Verio"), NTT America, Inc. ("NTT," as successor in interest to Verio), Endurance International Group Holdings, Inc. ("Endurance," as successor in interest to Verio) and Genacom, Inc. ("Genacom," collectively with AT&T, Verio, NTT, and Endurance, "Defendants" and each individually, a "Defendant") alleges as follows:

**JURISDICTION AND VENUE**

1.    This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are from different states and the matter in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

2.     This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) and O.C.G.A §9-10-91(2) and (3) because Defendants committed tortious acts within this state.

3.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims in this Complaint occurred in this district.

**THE PARTIES**

4.     My24 is a Colorado corporation doing business in the State of Colorado with its principal place of business located at 1550 Larimer Street, #779, Denver, Colorado. Mr. Erik Underwood ("Underwood") is the founder and Chief Executive Officer of My24. Mr. Underwood is a resident of the State of Colorado. My24 is a digital technology company that produces live digital video news content made accessible, *via* My24's proprietary broadcast platform, on mobile devices (*i.e.*, smartphones and tablets), and internet mediums. My24's live digital video news content is interactive and customizable so that a My24 customer can customize My24's live digital video news content according to his or her preference (*e.g.*, sports, entertainment, political news), and then cause the selected category of live updated digital video news content to be pushed, or sent, to the customer's smartphone, tablet or any other internet device, at a specified time without video buffering. In 2011, My24 was one of the earliest companies in what has become the Over The Top "OTT" revolution of content distribution.  OTT media distribution involves streaming content directly to consumers over the internet, bypassing traditional methods of distribution like satellite and cable. Although companies like Netflix had started to distribute content through OTT channels, My24 was ahead of most (if not all) OTT companies in that it was set to create content as well.  Had AT&T not engaged in the fraudulent behavior described herein, My24 would have

created and streamed original content in 2012. Netflix, for example, did not reach this milestone until 2013 when it streamed House of Cards – its first original content.

5. Defendant AT&T is a corporation formed under the laws of New York having its principal place of business at One AT&T Way, Bedminster, New Jersey. AT&T is a wholly-owned subsidiary of AT&T Inc. which is not a party to this action.

6. Upon information and belief, Defendant Verio was a global web hosting provider organized under the laws of Delaware having its principal place of business at 1203 North Research Way, Orem, Utah.

7. Defendant NTT is an information and communications technology solutions corporation formed under the laws of Delaware having its principal place of business at 757 Third Avenue, 14th Floor, New York, New York. Upon information and belief, Verio was merged into NTT and is a successor in interest to Verio. NTT is a wholly-owned subsidiary of Nippon Telegraph and Telephone Corporation ("NTT Corp."). NTT Corp. is one of the largest telecommunications companies in the world.

8. Defendant Endurance, is a web hosting corporation formed under the laws of Delaware, having its principal place of business at 10 Corporate Drive, Suite 300, Burlington, Massachusetts. Upon information and belief, Endurance acquired Verio and is a successor in interest to Verio.

9. Defendant Genacom is a website development and management company organized under the laws of California having its principal place of business at 433 Soscol Avenue A130, Napa, California 94559.

## NATURE OF THIS ACTION

10.     In 2011, My24, a technology start-up, designed a proprietary first-of-its-kind, cutting-edge, technical schematic of a backend digital platform ("Broadcast Platform") that would allow My24 to deliver, on demand and by customer preference, its interactive live video digital news content to smartphones, tablets, and other internet mediums. To develop the platform, My24 identified and vetted numerous entities, including AT&T - entities that it believed could properly build the platform and serve as potential investors for the company's novel idea. With this in mind, My24 selected AT&T to develop the Broadcast Platform, and initiated discussions with AT&T regarding its interest in investing in the company.

11.     In selecting AT&T, or the entity that it believed to be AT&T, My24 was under the impression that its Broadcast Platform, in fact, was being developed by AT&T and that any discussions regarding investment in My24 would be with actual AT&T representatives. Unbeknownst to My24, however, the individuals providing professional services to My24 were not AT&T representatives but, instead, were employees of third-party independent contractors with no authority to bind AT&T regarding professional services or investment. Defendants' misrepresentations were intentional and, upon information and belief, was part of a pattern and practice not unique to My24.

12.     These identity misrepresentations, however, were merely the first part in a two-step plan of customer deception by Defendants to generate sales revenue. As discussed in greater detail herein, Defendants' deception commenced with utilizing the lure of AT&T's brand to dupe unsuspecting customers, such as start-up technology companies like My24, into believing they were dealing exclusively with AT&T for services and potential investment opportunities. Once these unsuspecting customers were engaged, AT&T would then upsell them expensive AT&T

professional services, while misleading these customers into believing that AT&T would provide financial support for their businesses. Notwithstanding these misrepresentations and the fact that the majority of these entities had little to no funding or credit, AT&T would seek to collect the revenues from its fraudulent upsell of services – all with the goal of increasing AT&T's sales and revenues. Unsurprisingly, this well-orchestrated scheme worked to perfection on start-up My24.

13. Indeed, based on the funding promises of AT&T, My24 entered into two joint ventures with AT&T. Pursuant to the parties' joint venture agreements, My24 agreed, *inter alia*, that AT&T would serve as My24's exclusive platform provider for the company's broadcast content and would have co-branding and co-marketing rights in connection with the My24 Broadcast Platform. AT&T, in turn, agreed to invest more than $100 million in My24 by: (a) funding My24's launch during a presidential town hall meeting or a debate between then President Barack Obama and Republican Candidate, Governor Mitt Romney during the upcoming 2012 U.S. Presidential election (then later during a Presidential interview), and sponsoring this event; (b) funding My24's multimedia expansion; and (c) funding its operations.

14. Although AT&T fulfilled some of its duties under one of the joint venture agreements, e.g. working closely with My24 on logistics for the Presidential Town Hall debate, it ultimately failed to fulfill its funding obligations under each of its joint ventures with My24.

15. Additionally, on information and belief, AT&T has misappropriated, and continues to misappropriate, for its benefit My24's confidential trade secrets and intellectual property related to the development of the Broadcast Platform and the business plan created by My24 for implementation and generation of profits through the platform, which were subject to a non disclosure agreement between AT&T and My24.

16.     This First Amended Complaint seeks damages of at least $1.875 billion for AT&T's wrongful acts, as well as an order enjoining AT&T from using My24's novel idea and Broadcast Platform, and requiring AT&T to return the Broadcast Platform and associated intellectual property to My24.

## GENERAL ALLEGATIONS

### The My24 Broadcast Platform

17.     In 2011, My24 designed a novel technical schematic of a backend digital platform Broadcast Platform which would allow My24 to deliver its live video digital news content to smartphones and tablets, and other internet mediums. The Broadcast Platform was novel because it, *inter alia*, eliminated video buffering in the delivery of the live digital video news content. The Broadcast Platform also enabled My24 to be interactive, thus allowing a customer to customize My24's live digital video news according to his or her preference (*e.g.*, sports, entertainment, political news), and then cause the selected category of live updated digital video news content to be pushed, or sent, to the customer's smartphone, tablet or any other internet connected device, at a specified time. My24 was the first, and on information and belief the only company in 2011, to design a Broadcast Platform capable of delivering interactive, live video news content to smartphones, tablets, and other internet mediums, while eliminating buffering. The My24 Broadcast Platform also included a unique pastel color wheel called the "NewsWheel" containing icons representing the various types of My24 news content. These icons allow a My24 viewer to navigate My24's Broadcast Platform and view a news segment on demand.

18.     Mr. Underwood, My24's CEO and founder, believed the innovative Broadcast Platform and My24's interactive live video news content would revolutionize digital broadcast news.

19.     In or about late May 2011, My24, through its in-house expert, developed the backend specifications for the Broadcast Platform. My24, however, required a telecommunications provider to build the Broadcast Platform and to provide a dedicated media and data server that would distribute My24's digital media and news content globally over mobile data collection portals and fiber-optic channels.

20.     In or about late May and June 2011, My24 began contacting numerous telecommunications companies, including AT&T, Level 3, Inc., and Cisco, Inc. regarding the Broadcast Platform build out and the provision of a dedicated media and data server. In addition to the services of building out the Broadcast Platform and delivering its content, My24 also sought to attract an investment partner to fund the development of the platform and its business operations. Thus, a key factor in My24's selection of a provider to perform the above services was that entity's ability and willingness to also serve as an investment partner.

### The Selection of AT&T to Develop the Broadcast Platform and Commencement of AT&T/My24 Investor-Joint Venture Discussions

21.     During a discussion with Level 3, it was suggested to Mr. Underwood that he contact AT&T, which he did after finding an AT&T contact number on the internet. The AT&T representative referred him to the "AT&T web development department" and, shortly thereafter, Mr. Underwood was contacted by John Tharp ("Tharp"), who introduced himself as "AT&T web development services." Later, Mr. Underwood also received a follow-up call from an AT&T representative asking whether his earlier call had been returned by someone from AT&T web development services.

22.     With the understanding that he was dealing with AT&T personnel, Mr. Underwood began initial discussions with Tharp. In these discussions, Mr. Underwood and Mr. Tharp discussed how AT&T and My24 could cross-market in essentially the same manner AT&T and

Apple cross-marketed their respective services utilizing the iPhone. Specifically, Mr. Underwood and Mr. Tharp discussed a cross-marketing concept that contemplated AT&T preloading the My24 Application ("App") on every AT&T cell phone, and My24 advertising AT&T products on My24 banner ads and during commercial breaks of My24's programming. Based on these discussions, Mr. Underwood believed that he and AT&T were discussing the Broadcast Platform build out and a potential partnership of some sort with AT&T, a well-established brand in the telecommunications industry. As a result, AT&T quickly emerged as the top contender amongst the companies My24 was considering for the development of the Broadcast Platform.

23.     Significantly, throughout these early discussions regarding the Broadcast Platform build out and a potential business partnership between My24 and AT&T, Mr. Underwood was repeatedly assured that My24 would be connected with the proper individuals at AT&T to discuss a business venture between the entities. Unbeknownst to My24 and Mr. Underwood, however, neither Mr. Tharp nor the individuals who Mr. Tharp initially introduced to Mr. Underwood were AT&T representatives. Instead, these individuals were Verio and/or Genacom employees all posing as AT&T representatives – with AT&T e-mail addresses and other indicia of authority to act as AT&T.

24.     On or about June 21, 2011, Mr. Tharp provided Mr. Underwood with a document captioned "AT&T Project Definition/My24HourNews.com." Believing that My24 was discussing a professional services agreement with AT&T, Mr. Underwood confirmed with Mr. Tharp that My24 had selected AT&T to construct the Broadcast Platform, based in large part on AT&T's potential involvement as an investor/partner. Importantly, My24 conditioned its selection of AT&T for the Broadcast Platform build out on the conditions that AT&T agree: (a) that the Broadcast Platform and the intellectual property associated therewith would belong to My24; and (b) to

provide the Broadcast Platform exclusively to My24. Mr. Tharp did not object to these conditions, and advised Mr. Underwood that executives at AT&T were excited to be working on the My24 project because of the novel content delivery technology associated with the Broadcast Platform. Notably, Mr. Tharp did not correct Mr. Underwood's mistaken belief that Tharp was an authorized representative of AT&T.

25. Following numerous discussions between My24 and "AT&T representatives" the project's scope was revised to address the evolving nature of the Broadcast Platform project. Throughout this evolution, My24 insisted on owning all intellectual property developed in connection with the Broadcast Platform, and on AT&T's exclusivity as to delivery of My24's content.

26. In or about September 2011, Mr. Underwood began having discussions with Todd Olson ("Olson"), another individual who represented himself as an AT&T executive project manager, working on the Broadcast Platform project. Again, unbeknownst to My24 and Mr. Underwood, Mr. Olson too was employed by Defendant Verio as a Senior Director of Professional Services and Sales Engineering. Like Mr. Tharp, Mr. Olson actively concealed his true corporate affiliation throughout his discussions and correspondence with Mr. Underwood for the build out. As discussed in further detail below, all of Mr. Olson's e-mails were sent from an e-mail account that appeared to be hosted on an AT&T subdomain.

27. During the next several months, Mr. Olson and Mr. Underwood discussed, among other things, the terms of a non-disclosure agreement, the need for an account manager to be assigned to My24, and the possibility of a joint venture between My24 and AT&T. Throughout these discussions, relying upon Messrs. Tharp and Olson's apparent and stated authority to negotiate on behalf of AT&T, Mr. Underwood reasonably believed that he was contracting with

AT&T for the Broadcast Platform build out, and further reasonably believed that he was discussing a joint venture deal with AT&T.

28. As these discussions continued during the last quarter of 2011, Mr. Underwood continued his insistence that My24 own all of the intellectual property developed in connection with the Broadcast Platform, and that AT&T provide the Broadcast Platform exclusively to My24. Mr. Olson assured Mr. Underwood that My24 would retain all such intellectual property and that AT&T would exclusively provide the Broadcast Platform to My24.

29. Between January and April 2012, at the guidance of Mr. Underwood, yet unaware of their corporate identities, Verio and Genacom personnel continued designing and developing the Broadcast Platform while representing themselves as AT&T personnel. For example, commencing on or about March of 2012, Jennifer Currier ("Currier"), who unbeknownst to Plaintiff was a Genacom employee, regularly e-mailed Mr. Underwood for his approval of wire frames and platform development designs. Ms. Currier's communications with Mr. Underwood amounted to hundreds of e-mails pertaining to every aspect of the Broadcast Platform design. As discussed in greater detail below, all of these e-mails were sent from an e-mail account that appeared to be hosted on an AT&T subdomain.

30. Additionally, Mr. Olson requested that My24 provide the AT&T "team" with even more detailed backend specifications for the Broadcast Platform. In response to Defendants' request, Mr. Underwood, on or about April 6, 2012, provided Mr. Olson his [Mr. Underwood's] "notes on the technical design aspects for the different phases of this platform development." Mr. Underwood stressed to Mr. Olson that this information remain confidential. By e-mail dated April 6, 2012, Mr. Olson advised Mr. Underwood that "this document [Mr. Underwood's above-referenced notes] is excellent detail for the network and infrastructure team." In response to Mr.

Underwood's continued request that My24's documents and information remain confidential, Mr. Olson agreed that "[a]s always, we will continue to take your needs with confidentiality very serious." Conditioned on that assurance, Mr. Underwood provided Mr. Olson with updated specifications for the Broadcast Platform on May 24, 2012.

31.     In addition to discussions regarding the technical details for the Broadcast Platform, during March and April 2012, Mr. Olson and Mr. Underwood continued discussing the possibility of a joint venture between AT&T and My24 in connection with the Broadcast Platform. Among other things, Mr. Olson and Mr. Underwood discussed the cross-marketing opportunities of a joint venture; the various business units of AT&T that would be involved in a joint venture; and the possibility of AT&T providing My24 with a channel on AT&T U-Verse (AT&T's then television service using Internet Protocol Technology). In conjunction with these discussions, Mr. Underwood also advised Mr. Olson that My24 had elevated its profile by engaging former CNN/Time Warner executives and anchors, including Bob Furnad, as My24's President; John Heintschel, as My24's Chief Financial Officer; and Cindy Argendeli, as My24's Human Resources executive.

**AT&T, Verio, and Genacom's Continued Identity Misrepresentation**

32.     Upon information and belief, AT&T required that Verio and Genacom not use their own markings or branding to ensure that AT&T customers were made to believe they were dealing with AT&T, and not the actual party with whom they were engaged. My24, like many other unsuspecting parties, fell prey to Defendants' orchestrated misrepresentations.

33.     Thus, My24 was completely unaware that, instead of AT&T, it was discussing the development of its Broadcast Platform and potential investor/partnership opportunities with

individuals who were not representatives of AT&T, but in fact were employed by unrelated third parties – Verio and Genacom.

34. Here, upon My24's selection of AT&T to develop the Broadcast Platform and during its early stage build out, as detailed *supra*, My24 communicated extensively with Messrs. Tharp and Olson of Verio and Ms. Currier of Genacom. Although none of these individuals were AT&T employees, AT&T authorized and directed that their employers - Verio and Genacom - instruct their employees when dealing with My24 to hold themselves out as such. Indeed, following AT&T's directive, Verio and Genacom understood that for both AT&T and My24, the "***ATT [sic] relationship [was] very important here so it [was] absolutely essential to come through as ATT [sic] in all things . . . .***"

35. Notably, each of the Verio and Genacom personnel posing as AT&T employees were assigned e-mail addresses with an "*att*" subdomain. For example, when corresponding with My24, Tharp and Olson's e-mail addresses were conveyed, respectively, as "jtharp@att-webhosting.com" and "tolson@att-webhosting.com." Similarly, when corresponding with My24, Currier's e-mail address was conveyed as "jennifer.currier@att-professionalservices.com." The actual business e-mail addresses for these individuals, however, were wholly-unrelated to AT&T. Mr. Tharp and Mr. Olson's true business e-mail addresses were "john.tharp@verio.net" and "todd.olson@verio.net," respectively. While, Ms. Currier's true business e-mail address was "jcurrier@genacom.com." Upon information and belief, these e-mail addresses were utilized by and among AT&T, Verio and Genacom for their intra-group communications regarding My24. Upon further information and belief, Verio specifically purchased the "att-professionalservices.com" web address for use in connection with the build out of My24's Broadcast Platform.

36. Even the telephone voicemail greetings for the Verio and Genacom personnel purporting to be AT&T employees were recorded so as to not reveal their true affiliations – again, a coordinated and intentional act. Indeed, with respect to telephone communications, it was clear to Verio and Genacom that "the biggest thing [was] that the [voicemail greeting] . . . [be] just a generic message."

37. My24 and its representatives, however, were unaware of the true corporate identities and affiliations of Verio, Genacom or any of their employees working under the guise of being AT&T representatives, and did not become aware of the actual corporate affiliations of these individuals until long after My24 had been damaged by Defendants' fraudulent behavior. Again, AT&T, on the other hand, was not only aware of these misrepresentations but, upon information and belief, required them in furtherance of its business relationship with Verio and Genacom.

38. For AT&T, it was essential for My24 to believe the misrepresentation that it was actually dealing with AT&T - not Verio and/or Genacom. This deception was critical to secure the engagement for My24's Broadcast Platform build out and to generate revenue from a variety of ancillary professional services relating thereto. Accordingly, AT&T was willing to promote any representation it viewed as necessary to secure and profit from the My24 revenue "opportunity."

## AT&T/My24's Partnership Discussions

39. During a conference call held on April 20, 2012, Mr. Olson advised Mr. Underwood that AT&T had assigned Barbara Pepe ("Pepe") as the account manager for My24. Ms. Pepe was at the time an Executive Account Manager for AT&T Services, Inc. AT&T Services, Inc. is a wholly owned subsidiary of AT&T, Inc. Mr. Olson explained to Mr. Underwood that Ms. Pepe (who also participated on the call) would serve as the official liaison between AT&T and My24. Mr. Olson further explained to Mr. Underwood that Ms. Pepe would be responsible for

coordinating the various AT&T business units, *e.g.*, AT&T mobility and AT&T U-Verse, which would be interacting with My24. Mr. Olson also explained during this call that Ms. Pepe would be responsible for coordinating joint venture discussions between AT&T and My24 in connection with the Broadcast Platform.

40.     Meanwhile, Defendants continued developing the Broadcast Platform. On or about May 1, 2012, Ms. Currier provided Mr. Underwood with the Development Specification for Phase 1 of the Broadcast Platform project for his approval. This document provided a comprehensive overview of all the technical design requirements identified throughout the initial design phase for My24, including, *inter alia*, development requirements for the My24 logo and icons, landing page, supporting website graphics, *e.g.*, the My24 "NewsWheel," content management, administration, mobile enabled design, and mobile application.  As of that date, My24 and AT&T had not executed a formal, written agreement regarding the Broadcast Platform build out project; and, tellingly, AT&T did not request any form of payment from My24 (deposit or otherwise) for the development of the Broadcast Platform, neither prior to nor during its commencement of work on the platform, even though AT&T was aware that My24 was a start-up company with no credit and limited funds.

41.     After the April 20, 2012 conference call, Ms. Pepe and Mr. Underwood had daily telephone calls regarding the Broadcast Platform and the potential joint venture between AT&T and My24. In discussing the potential joint venture, Mr. Underwood advised Ms. Pepe of the significant investment My24 sought from AT&T in light of, *inter alia*, My24's anticipated expenses in launching the Broadcast Platform and in conducting business operations. Ms. Pepe advised Mr. Underwood of AT&T's interest in the significant branding opportunity that such venture would afford AT&T, as well as AT&T's interest in obtaining a percentage ownership interest in My24.

42.     In furtherance of these discussions, Ms. Pepe and Mr. Underwood agreed to a two-day partnership/investment meeting between AT&T and My24 to be held in Atlanta, Georgia on May 31 and June 1, 2012. By e-mail dated May 8, 2012, Ms. Pepe requested Mr. Underwood to "provide the details for the meetings for 5/31 and 6/1 so that the AT&T Account Team [could] move forward with travel arrangements." Ms. Pepe further advised Mr. Underwood that she would "be inviting [AT&T's] supervisors and someone from AT&T Marketing."

43.     On or about May 8, 2012, Mr. Underwood provided Ms. Pepe and Mr. Olson with "a preliminary agenda . . . for our meeting later this month." Mr. Underwood prepared the agenda based on his communications with Ms. Pepe and her suggestions regarding appropriate topics. The agenda included the following topics:

- "What is My24HourNews.Com? - Power Point."

- "Technical Components Discussion/Winston will explain broadcasting components and requirements related to My24/AT&T platform build out, steps, phases, and execution of what is needed. -PowerPoint Presentation."

- "Question/Answer Period-Technical questions fielded by Winston and Erik"

- "My24's Six Revenue Streams - Overview of My24/AT&T upside. Worst-case scenario and best case outlook."

- "My24HourNews.Com overview platform build out and project objectives/Todd & Jennifer - Jennifer will explain how My24HourNews.Com can be number 1 in the world."

- "What does a My24HourNews.Com Partnership looks [sic] like with AT&T? - PowerPoint model 'All Rising Tides Lifts All Boats.' Exclusivity = Investment Deal & Resources."

- "My24 broadcast on AT&T Uverse . . . . What will the user/viewer experience look like with future brands?"

- "AT&T Mobility. . . . a My24 preloaded on every AT&T cell phone/Jennifer, Dana, & Todd will discuss the unique My24 News App with ERICA."

- "Product Sponsorship and placement - AT&T/Apple for My24."

- "Discussion on bring [sic] all of the AT&T divisions together in order to achieve Partner/Investment goals that will bring in a successful launch."

44. Removing any doubt regarding the purpose and/or focus of the partnership meeting, Mr. Underwood provided Ms. Pepe with a document entitled "Strategic Global Partnership of Information/News Dominance." This document provided, among other things, that the purpose of the partnership meeting was to explain My24's structure, where it was headed, and "to align a strategic partnership between AT&T and My24; to have global dominance of Non-Commentary News, Music, Movies, and other Brands associated with My24." This document also proposed that the distribution of content and programming be made on smartphones and tablets, as well as on an AT&T U-Verse channel.

45. On or about May 11, 2012, in anticipation of the upcoming partnership meeting, My24 and AT&T signed a Mutual Non-Disclosure Agreement ("NDA") to govern each party's duties of confidentiality. Under the NDA, AT&T and My24 agreed that "Confidential Information" included, *inter alia*, pricing and financial data, network designs and design proposals, analyses, proposals, business plans, forecasts, plans and specifications of any product or service, drawings, models, software, and prototypes.

46. After executing the NDA, Mr. Underwood provided Ms. Pepe with My24's Executive Summary and Market Strategic Analysis. The Executive Summary set forth in detail, *inter alia*, My24's marketing and revenue summaries, expenses, and capital needs for the launch of My24. The Market Strategic Analysis also analyzed the market for smartphones and tablets and showed that My24 would likely become a multi-billion dollar company based on advertising revenues. The information contained in the Executive Summary and Market Strategic Analysis

formed the basis of the business plan (the "Business Plan") later provided to AT&T, as discussed below.

47.　　On or about May 18, 2012, Ms. Pepe provided Mr. Underwood with a tentative list of AT&T attendees (the "AT&T Account Team") for the AT&T/My24 partnership meeting:

- Barbara Pepe - Wholesale Sales Executive
- Michael McCreary - Wholesale Applications Sales Executive
- Blair Bardwell - Wholesale Sales Director
- Scott Hogg - Lead Channel Manager, Business Marketing
- Lee Culver - AVP Video Development U-Verse
- Matt Henschel - Wholesale Mobility Sales Executive
- Terry Sellers - Enterprise Mobility Integration Manager
- Larry Kahn - Wholesale Network Integration Manager
- Aaron Gage - Wholesale Hosting Sales Executive

48.　　Ms. Pepe advised Mr. Underwood that she had distributed to the AT&T Account Team the documents he had provided to her for the upcoming AT&T/My24 partnership meeting, and that these AT&T Account Team members had expressed much interest and excitement regarding the proposed joint venture.

### Day One of the AT&T/My24 Partnership Meeting

49.　　On May 31, 2012, AT&T and My24 representatives participated in the first day of the partnership meeting. At this time, the development of the Broadcast Platform was almost complete. My24, however, still had not executed any agreements with AT&T in connection with the Broadcast Platform build out, with the exception of the NDA.

50.　　The individuals identified in paragraph 46, *supra*, attended the AT&T/My24 partnership meeting on behalf of AT&T. In addition, Mr. Olson participated on behalf of AT&T,

and was introduced in the meeting as an AT&T representative. Ms. Currier and Dana Yates also participated telephonically on behalf of AT&T.

51. The following persons attended the AT&T/My24 partnership meeting on behalf of My24:

- Erik Underwood - Chief Executive Officer
- Colonel (Retired), Anthony C. Aiken - Board Member
- Former Mayor of Atlanta, Hon. Shirley C. Franklin – Board Member
- Pamela Harris - Chief Operations Officer/Board Member
- Judge (Retired), Thelma Wyatt Moore - General Counsel
- Cindy Argendeli - Executive Director Human Resources
- Winston Johnson - Chief Technical Officer
- Alson Jones - Animator and Cartoonist contracted by My24 in connection with My24's eventual progression to provide multimedia digital content
- Vance Hornbuckle - President/Music
- Mac Hunter - Outside Legal Counsel

52. Additional attendees at the AT&T/My24 partnership meeting included Michelle Williams, an account manager from the Associated Press, and Robert Posner ("Posner"), the President of Posner Advertising in New York, who My24 intended to engage as its advertising representative. Notably, all of the third-party attendees at the AT&T/My24 partnership meeting signed a non-disclosure agreement in favor of My24.

53. During the first day of the AT&T/My24 partnership meeting, Mr. Underwood provided the AT&T Account Team with My24's Executive Summary and the Market Strategic Analysis. Mr. Underwood explained the proposed joint venture pursuant to which AT&T Mobility would preload the My24 App on every AT&T smartphone and exclusively deliver My24's live digital video news content to smartphones, tablets, other internet devices, and over an AT&T U-

Verse channel. Mr. Underwood further explained that AT&T would provide product sponsorship and placement, would cross-market AT&T, and would co-brand its name with My24.

54.     Mr. Underwood then explained how the proposed joint venture would substantially increase the revenues generated by the various associated AT&T business units.   Mr. Underwood further advised the participants that under the proposed AT&T/My24 joint ventures, AT&T would invest $25 million for My24's launch, $2.2 million for headquarters' expenses, and $75 million for brand development for My24's other digital media brands, for a total investment of $102.2 million.

55.     During the first day of the AT&T/My24 partnership meeting, AT&T explained how it could bring all of the divisions of its various subsidiaries together to achieve the proposed partnership/investment goals and successfully launch My24. AT&T also detailed how it could provide My24 with a channel on U-Verse.  AT&T would be the exclusive provider of My24, would receive 20% of My24, and would co-brand AT&T with My24.

56.     Also during this first day, Blair Bardwell ("Bardwell"), who took a leading role in the meeting on behalf of AT&T, stated that AT&T's installation of a My24 App on AT&T cellphones would greatly benefit AT&T and that AT&T was excited about the cross-marketing possibilities. Lee Culver ("Culver") agreed that if the parties entered into a joint venture, AT&T would provide My24 with a channel on U-Verse and that AT&T would develop and perform beta testing on a new AT&T U-Verse platform. Mr. Culver also stated that the new AT&T U-Verse platform would allow a My24 App to slide from a smartphone or tablet onto a television which would allow a customer to view, and interact with, My24 on the customer's television.

**Day Two of the AT&T/My24 Partnership Meeting**

57. On June 1, 2012, AT&T and My24 participated in the second day of the AT&T/My24 partnership meeting. Immediately prior to commencement of the day two meeting, Mr. Bardwell and Ms. Pepe asked Mr. Underwood to leave the conference room so they could speak to him in private.

58. During this private meeting, Mr. Bardwell advised Mr. Underwood that AT&T accepted My24's joint venture proposal regarding the launch of My24 (the "Launch JV") on the condition that My24 agree to launch My24 at a presidential town hall meeting or a debate (a "Presidential Town Hall Meeting"), between then President Barack Obama and Republican Candidate Mitt Romney during the then upcoming 2012 U.S. Presidential election.

59. Mr. Bardwell also advised Mr. Underwood that as part of the Launch JV, AT&T would sponsor My24's launch during the Presidential Town Hall Meeting and would cross-market and co-brand AT&T with My24 during this launch.

60. Mr. Bardwell further stated that AT&T would agree to provide the Broadcast Platform to My24, *i.e.* AT&T would not provide the Broadcast Platform to any other person, and My24 could not use another common carrier to deliver My24 live digital video news content.

61. Mr. Bardwell further proposed to Mr. Underwood that AT&T would provide My24 an additional $75 million for My24's multimedia expansion (the "Multimedia Expansion JV"), if My24 would in turn: (a) grant AT&T a 20% interest; (b) agree to exclusive cross-marketing and co-branding rights; and (c) agree to launch My24 during a Presidential Town Hall meeting. My24 agreed to each of AT&T's conditions regarding the Multimedia Expansion JV.

62. Mr. Underwood advised Mr. Bardwell that My24 agreed to Mr. Bardwell's conditions.

63.     Upon Mr. Underwood's acceptance of AT&T's conditions, My24 and AT&T had entered into the Launch JV and the Multimedia Expansion JV.  Neither My24 nor AT&T expressed a desire or requirement that any other term was essential to the Launch JV or Multimedia Expansion JV, or needed to be detailed or agreed upon at the time of the parties' entry into the joint venture agreements.

64.     After this private meeting, Mr. Underwood, Mr. Bardwell and Ms. Pepe reentered the conference room. Mr. Underwood announced to all of the participants that AT&T agreed to the Launch JV, pursuant to which AT&T agreed to fund My24's launch, and My24 agreed to launch My24 in a Presidential Town Hall Meeting during the then upcoming 2012 U.S. Presidential election. Mr. Underwood also announced to participants that AT&T also agreed to the Multimedia Expansion JV.

65.     After Mr. Underwood's initial remarks about the joint ventures, Mr. Bardwell interjected, announcing to the meeting participants the specific dollar amounts for the joint ventures -  AT&T would provide My24 a total of $102.2 million and My24 would grant AT&T a 20% interest in My24, along with exclusive cross-marketing and co-branding rights.

66.     The My24 meeting participants, including Mr. Underwood, were completely unaware, however, that prior to the preliminary meeting on day two between Underwood and Bardwell and Pepe (the "AT&T Reps."), there had been a meeting earlier that morning between the AT&T Reps and Olson.  During that meeting, Bardwell informed Olson, in the presence of Pepe, that there was no way AT&T would provide the funding requested by My24.

**AT&T and My24 Move Forward on the**
**Launch JV During the Presidential Town Hall Meeting**

67.     Several days after the partnership meeting, Mr. Bardwell asked Mr. Underwood whether he would contact the appropriate officials to begin discussions about the Presidential Town

Hall Meeting. Mr. Underwood agreed to do so, but requested that AT&T provide My24 with a document showing AT&T's agreement to sponsor the event. Given that My24 was a start-up technology company and virtually unknown in media and political circles, Mr. Underwood explained that he would need to show this document to the political parties and to persons associated with the forum in which the Presidential Town Hall Meeting would be held to apprise them of AT&T's involvement and to ensure that My24's request to broadcast the town hall would be taken seriously. Mr. Bardwell agreed that AT&T would provide My24 with this document.

68.     On or about June 4, 2012, Mr. Bardwell sent Mr. Posner and Mr. Underwood the Harvard Business School format for business plans, noting that he "would like to offer [My24] a format that I find very helpful in presenting a business plan." Mr. Bardwell further stated that he "need[ed] to build a story in a format that [his] peers [were] familiar with."

69.     Mr. Bardwell also explained that "AT&T [was] really interested in NPS [Net Promoter Score], and therefore we need to think about how My24HourNews.Com [would] help us elevate those scores." Upon information and belief, an entity's "net promoter score" is a tool used to gauge the loyalty of a firm's customer relationships.

70.     On or about June 18, 2012, at the request of Mr. Bardwell, Mr. Underwood sent Bardwell the My24 Business Plan (the "Business Plan") in the Harvard Business School format which, among other things, set forth AT&T's total investment in My24 and AT&T's corresponding equity interest in My24. Mr. Underwood also provided Mr. Bardwell with My24's Summary Pro Forma Profit and Loss document and My24's Headcount and Personnel Expense document.

71.     On June 21, 2012, Ms. Pepe arranged for a conference call to be held on June 22, 2012, that included Ms. Pepe, Mr. Bardwell, Mr. Underwood, Pamela Harris; Ms. Lynne Jansons of MEC Global, Shahab Azmoudeh (an AT&T network engineer), and Michael McCreary (Ms.

Pepe's assistant). The subject of the call, as identified in an e-mail to the call participants, was "Sponsorship Discussion for My24."

72.     On information and belief, MEC Global is the fifth largest media agency network in the world.   MEC Global provides advertising, brand marketing, brand partnership, and sponsorship activation services to AT&T. On further information and belief, during the planning of the Presidential Town Hall Meeting, Ms. Jansons was a Digital Director for MEC Global. Ms. Jansons' duties included, among other things, handling first-to-market opportunities, emerging technologies and sponsorship activation. Ms. Jansons advised Mr. Underwood that she was providing marketing and sponsorship activation services for AT&T in connection with the Presidential Town Hall Presidential Meeting.

73.     During the June 22, 2012 conference call, the parties discussed My24's financial needs, as well as the resources that would be needed to successfully launch My24 during the Presidential Town Hall Meeting. The parties also discussed expenses for advertising, security, marketing, forum, stage backdrop, hotels, and finalization of the Broadcast Platform and associated facilities. The parties discussed possible venues, the AT&T divisions involved, and simulcasting My24 on an AT&T U-Verse channel. Mr. Bardwell pressed Mr. Underwood on obtaining a venue. The parties again discussed the sponsorship letter. Mr. Bardwell also referenced and affirmed the Launch JV, which entailed funding the Broadcast Platform build out, funding My24's launch, and sponsoring the Presidential Town Hall Meeting. Mr. Bardwell further advised Mr. Underwood that although the funding was assured, it had to be processed through the required AT&T channels.

**AT&T Provides My24 with a Sponsorship Letter to Use with the
<u>Obama and Romney Campaigns for the Town Hall Discussions</u>**

74.     On June 14, 2012, Mr. Underwood, per his discussions with AT&T, sent an e-mail to David Axelrod, President Obama's campaign advisor.  Pursuant to this e-mail,  Mr. Underwood advised Mr. Axelrod of My24's service and that My24 was proposing two separate Presidential Town Hall Meetings. Mr. Underwood further advised Mr. Axelrod that "[t]he Town Halls [would] include President Obama and Governor Romney, with AT&T sponsoring the event as a public service event for national and international viewers of My24HourNews.Com." Mr. Underwood further stated "[w]e will take care of all production costs and arrangements." Mr. Underwood also stated "[w]e will also choose an important swing state (Ohio, Florida or Pennsylvania) focusing on jobs, the economy, and small business." Mr. Underwood added "AT&T will help with the marketing effort and will plan to accommodate internet traffic for 70 to 80 million viewers."

75.     On or about June 22, 2012, Ms. Pepe provided Mr. Underwood with a draft sponsorship letter (the "Sponsorship Letter") for Mr. Underwood's approval, stating that she would like his thoughts prior to getting approval from AT&T legal. Mr. Underwood approved the Sponsorship Letter. Later, on the same day, Ms. Pepe telephoned Mr. Underwood and advised him that he could send the Sponsorship Letter to both political camps and to the forum hosting the Presidential Town Hall Meeting.  With the Sponsorship Letter in hand, Mr. Underwood further communicated with the Obama and Romney campaigns in an effort to secure the Presidential Town Hall Meeting in accordance with the Launch JV.

76.     In furtherance of the Launch JV and coordinating the Presidential Town Hall Meeting, Mr. Underwood also telephoned David Plouffe, President Obama's Senior Whitehouse Political Advisor; and Kevin Lewis, President Obama's Communications Director. Mr. Underwood also communicated with Mr. Romney's campaign regarding the Presidential Town Hall Meeting, and advised it that Ms. Pepe and Scott Hogg ("Hogg") from AT&T were working

closely with My24 and coordinating My24's technical requirements in connection with the Presidential Town Hall Meeting.

77.     Mr. Underwood kept Ms. Pepe apprised of all of his communications with the Obama and Romney campaigns and his use of the Sponsorship Letter.

78.     On or about June 26, 2012, Ms. Pepe advised Mr. Underwood that, with respect to the Presidential Town Hall, she needed to know "1. Where the Town Hall [would] be broadcast? 2. What is the viewership you expect on My24? 3. How and when will the news access lottery be held?" Ms. Pepe also provided Mr. Underwood with information on past Presidential Town Hall/debate viewership.

79.     In June 2012, during the planning for the Presidential Town Hall Meeting, the Defendants finalized the development of the My24 Broadcast Platform, and Ms. Pepe coordinated the technical discussions relating thereto between AT&T and My24.  Significantly, as of this time in June of 2012, AT&T and My24 still had not executed written agreements regarding the development of the Broadcast Platform.

**The Sponsorship Letter for the Presidential Town Hall Meeting**

80.     Although Ms. Pepe had already approved Mr. Underwood's use of the Sponsorship Letter for the Presidential Town Hall Meeting on June 22nd, Ms. Pepe contacted Mr. Underwood in late July 2012 to further discuss the letter. Specifically, by e-mail dated July 27, 2012, Ms. Pepe provided "the verbiage that My24 [could] use to provide a letter to the political camps on My24 Letterhead." Ms. Pepe also advised Mr. Underwood that he could copy both her and Mr. Hogg on the Sponsorship Letter "as AT&T representatives on this project." The Sponsorship Letter attached to Ms. Pepe's e-mail was essentially identical to the letter Ms. Pepe verbally approved on June 22,

2012. Notably, Ms. Pepe's July 27 e-mail included Mr. Bardwell, Mr. Hogg and Wendi Fuller of Fleishman Hillard as copied recipients.

81. On information and belief, Fleishman Hillard is an international marketing and advertising company that provides, among other things, brand marketing, sponsorships, and strategic partnership services to AT&T.

82. Despite having authorized Mr. Underwood's use of the Sponsorship Letter - verbally on June 22nd, and again by e-mail on the morning of July 27th - Ms. Pepe, by subsequent e-mail on July 27th, advised Mr. Underwood that there would be additional discussions the following week regarding the Sponsorship Letter and to refrain from using the letter until she got back to him. Ms. Pepe further advised Mr. Underwood that she would provide another draft to him as soon as it was available. Ms. Pepe did not mention in her e-mail that she had previously consented to Mr. Underwood's use of the Sponsorship Letter back on June 22nd, and that she had known that Mr. Underwood had already sent the letter to the respective political camps.

**AT&T Affirms Its Financial Support for My24 in**
**Connection with the Launch JV and the Presidential Town Hall**

83. During late summer/early fall 2012, AT&T continued to act in furtherance of the Launch JV, actively encouraging Mr. Underwood to continue his efforts in connection with the Presidential Town Hall Meeting and the launch of My24.

84. Specifically, on or about August 9, 2012, Ms. Pepe scheduled a conference call for the following day requesting the e-mail's recipients to "[p]lease attend this conference call to discuss the Presidential Town Hall with Ohio State University and My24HourNews.com." Ms. Pepe's e-mail was sent to, among others, Mr. Underwood, Mr. Hogg and Joe Camoriano ("Camoriano"), Director of National Broadcast Media at Ohio State University ("Ohio State").

85.     As part of the August 10th conference call, AT&T and My24 wanted to assure Ohio State, that AT&T would be sponsoring the Presidential Town Hall Meeting. This assurance was necessary for Ohio State's participation in hosting the town hall, as the parties recognized that My24, as a start-up, lacked the reputation or experience in connection with conducting or broadcasting a town hall meeting of any nature. Accordingly, during the conference call, Ms. Pepe represented to Mr. Camoriano that AT&T would be sponsoring the Presidential Town Hall Meeting. The call participants also discussed, among other things, the various expenses that would be associated with the event, including security, rent, venue, stage production and event tickets. Notably, Mr. Hogg explained that the Presidential Town Hall Meeting tickets would be in the form of holographic tickets containing the words AT&T/My24. Ms. Pepe assured Mr. Camoriano that AT&T would fund all of these expenses.

86.     On or about August 16, 2012, less than a week after the conference call, Mr. Underwood traveled to Columbus, Ohio to meet with Mr. Camoriano regarding the Presidential Town Hall Meeting. During this meeting, Mr. Camoriano provided Mr. Underwood with a tour of the Archie M. Griffin Grand Ballroom and the Performance Hall, and gave Mr. Underwood potential dates during the month of October 2012 for the town hall.

87.     Shortly, after Mr. Underwood returned from Columbus Ohio, AT&T requested that My24 sign a Wholesale Master Service Agreement (as amended), a Network Integration Services and Equipment Resale Pricing Schedule, a Content Delivery Network Pricing Schedule, and a Synaptic Hosting Service Pricing Schedule (collectively the "Network Agreements"). By e-mail dated August 22, 2012, Ms. Pepe advised My24 that she "would like to see the agreements signed by Friday if at all possible…. We are behind in the project now and do not want to have any additional delays that could affect the site being up for the launch."

88.     Accordingly, on or about August 23, 2012, My24 executed the Network Agreements, with Ms. Pepe's assurances that AT&T would perform its obligations under the Launch JV and Multimedia Expansion JV.  The work for the build out of the Broadcast Platform had been completed nearly two months earlier.

89.     Consistent with Mr. Olson's repeated assurances, the Network Agreements contained, among other things, provisions specifically noting that the intellectual property created in developing the Broadcast Platform belonged to My24.

90.     On or about August 27, 2012, following My24's execution of the Network Agreements and in furtherance of the launch, Ms. Pepe sent Mr. Underwood a "message to give a snapshot of where we are today with the My24HourNews.Com Project that the AT&T team has been working on for your company."  Ms. Pepe advised that "[t]he agreements for Network Integration (website), the Synoptic Hosting and Content Delivery Network were signed by you on 8/23 and the AT&T team is moving forward to implement these agreements to be ready for the implementation and testing of the website." Ms. Pepe further noted that "Todd Olson will  be scheduling a meeting with the Website Development Team, the AT&T Technical Team and your Studio Staff to validate and finalize the additional requirements for your studio." Ms. Pepe provided a further detailed breakdown on the tasks being performed in connection with My24's launch and the Presidential Town Hall Meeting.  Specifically, Ms. Pepe advised Mr. Underwood that:

> "Scott Hogg is working on Branding with AT&T and will follow up with you later to discuss the status. We will be working with the Mobility Teams and the Uverse teams to see what type of Marketing we might be able to have set up for the Town Hall Event.
>
> Lee Culver from Uverse will be working with Todd Olson on Uverse enabled for your company. Todd and I will contact you when we are ready to discuss.

I will plan a trip to Atlanta after you are in the studio location to meet with your Staff and Project team.

I look forward to the Press Conference and the Presidential Town Halls that will be held in Ohio State University."

91.     AT&T's preparations for the Presidential Town Hall Meeting and My24's launch continued well into September 2012.   In fact, Ms. Pepe arranged for a September 14, 2012 group conference call entitled: "Branding Discussion," which included Ms. Pepe, Mr. Hogg, Mr. Underwood and Mr. Posner.   During this branding call, Mr. Hogg expressed AT&T's desire that tents be placed outside the Presidential Town Hall Meeting prominently displaying AT&T's logo, that the logo be prominently displayed on the stage, and that advertising for the event provide that AT&T was sponsoring the Presidential Town Hall Meeting. Mr. Hogg also indicated during the call that AT&T would distribute T-shirts, displaying AT&T's logo.

92.     Also during the September 14th conference call, the participants discussed the funding necessary to advertise and promote the Presidential Town Hall Meeting. Mr. Underwood advised Ms. Pepe and Mr. Hogg that he estimated expenses, including advertising expenses, to be approximately $8 million. Mr. Posner, My24's advertising representative, advised the participants that advertising expenses would be approximately $3 million to $4 million. The remaining $4 million to $5 million in expenses would be for, among other things, producing the Presidential Town Hall Meeting, security, hiring talent, and payment to Ohio State. In response to these amounts, Ms. Pepe stated that AT&T was committed to funding the event, and that she needed some time to go through the appropriate channels at AT&T to obtain the funds.  Ms. Pepe, however, was unequivocal in her representation that AT&T's funding of the event was assured.

93.     On or about October 10 and 11, 2012, My24 and AT&T participated in another two-day meeting in Atlanta to solidify arrangements for the Presidential Town Hall Meeting and to

further assess My24's technical and financial requirements for the launch, and AT&T branding ideas for the town hall. Meeting attendees included Ms. Pepe, Mr. Hogg, Mr. Olson, Mr. Culver, and Mr. Underwood. Ms. Pepe again assured Mr. Underwood that AT&T would fund the Presidential Town Hall Meeting and provide everything necessary to launch My24.

### AT&T Affirms Financial Support of My24 to Assist My24 in Obtaining a New Studio Location

94.     In October of 2012, My24's Atlanta studio experienced foundation problems and water damage, requiring My24 to locate to another suitable studio. Mr. Underwood advised Ms. Pepe of these issues, to which Ms. Pepe advised that AT&T would provide a studio *via* an AT&T satellite truck from which My24 could operate in connection with the launch during the Presidential Town Hall Meeting, and as needed for its temporary studio location.

95.     In connection with My24's search for a permanent studio location, Mr. Underwood met with Gail Glass ("Glass") and Jeremy Coppels ("Coppels"), representatives of the Boxer Property Management Corporation ("Boxer"), regarding a lease for a permanent studio at the Hurt Building located in downtown Atlanta, Georgia. Mr. Underwood, Ms. Glass and Mr. Coppels began discussions regarding My24's lease of approximately 15,000 square feet of space in the Hurt Building. Recognizing, however, that My24 was a start-up enterprise without a credit history, Ms. Glass and Mr. Coppels, required that AT&T verify that it was providing financial support for My24's operations prior to engaging in substantive discussions with My24 regarding a lease of space. Accordingly, on or about November 16, 2012, Mr. Underwood, Ms. Pepe, Ms. Glass and Mr. Coppels participated on a conference call for the purpose of discussing AT&T's financial support of My24. During the call, Ms. Pepe represented to Ms. Glass and Mr. Coppels that AT&T and My24 were partners. Ms. Pepe further represented to Ms. Glass and Mr. Coppels that AT&T

was assisting My24 with the technical components of the launch, and that AT&T was financially supporting the launch.

96.     Based on Ms. Pepe's representations regarding AT&T's technical and financial backing, My24, Mr. Underwood, Ms. Glass and Mr. Coppels negotiated terms for My24's studio lease at the Hurt Building, including a $15,000 monthly rent payment with a rent concession for the first five months of the lease and the build out of a "Today Show" type studio design pursuant to Ms. Pepe's suggestion. Based on AT&T's representations, Ms. Glass and Mr. Coppels agreed to provide My24 with over $100,000 in building concessions to create such a studio design.

97.     While Mr. Underwood was waiting on AT&T's funding and the build out of My24's studio at the Hurt Building, Ms. Pepe suggested that My24 locate to a temporary studio from which to broadcast. After speaking with Mr. Underwood and Ms. Pepe regarding temporary studio options for My24, Mr. Olson referred Mr. Underwood to Dirk Freeman, a broadcast studio owner in Denver, Colorado. Mr. Freeman advised Mr. Underwood that he could provide the studio space and the necessary talent and producers My24 needed to launch.  Following these discussions, Mr. Underwood agreed to temporarily locate My24 to Mr. Freeman's Denver studio facility.

### AT&T and My24 Change the My24 Launch Event From the Presidential Town Hall Meeting to a Presidential Interview

98.     As the 2012 Presidential election drew near and plans for the Presidential Town Hall Meeting were still incomplete, the parties became concerned that it would be too late to launch My24 during a Presidential Town Hall Meeting.  As a result, Ms. Pepe pivoted, urging Mr. Underwood to launch My24 during a presidential interview ("Presidential Interview"). Ms. Pepe assured Mr. Underwood that this change in plans would still be pursuant to the Launch JV, and that AT&T would sponsor the event and fund the launch.

99. AT&T, however, never sponsored the Presidential Town Hall Meeting or the Presidential Interview. Additionally, AT&T never funded the Launch JV or the Multimedia Expansion JV.

### AT&T's Acquisition of DirecTV and Proposed Merger with Time Warner

100. Upon information and belief, on July 24, 2015, AT&T completed an acquisition of DirecTV. In conjunction with the DirecTV acquisition, AT&T disclosed and/or utilized trade secrets relating to My24's Business Plan and intellectual property associated with the Broadcast Platform.

101. Upon information and belief, on October 22, 2016, AT&T announced a merger with Time Warner Inc. ("Time Warner"). In conjunction with AT&T's proposed acquisition of Time Warner, upon information and belief, AT&T has disclosed and/or utilized trade secrets relating to My24's Business Plan and intellectual property associated with the Broadcast Platform.

### COUNT I
### Fraudulent Inducement – Network Agreements
### (All Defendants)

102. Plaintiff repeats and re-alleges paragraphs 1 through 101, as if fully set forth herein.

103. For the purpose of procuring Plaintiff's money, Defendants, acting in concert and as agents of each other, verbally and through written communications, represented that AT&T was performing the professional services for which My24 contracted.

104. Agents and representatives of Defendants represented that only AT&T was performing the Broadcast Platform build out and related professional services needed for My24's launch, and that AT&T was interested in investing in My24. Defendants made these representations for the purpose of inducing Plaintiff to enter into lucrative professional services contracts and to procure trade secrets from Plaintiff while Defendants knew that AT&T was not

performing the subject professional services and that the individuals at AT&T with authority to authorize such investment in My24 had not expressed interest in investing in My24.

105.    The fraudulent representations made by Defendants include, but are not limited to the following:

(a) Defendants' use of AT&T's brand and trade dress in its communications with respect to My24 – including use of e-mail formats (specifically, with My24, all e-mails between Underwood and Defendants in late 2011 and early 2012 using the e-mail addresses detailed in paragraph 34 *supra*) that were designed to make parties (such as My24) believe that they were dealing with AT&T and not a third-party company;

(b) for the purpose of deceiving customers into believing that they were communicating with AT&T employees, use of deliberately vague and generic voicemail greetings that specifically did not mention the third-party company's name;

(c) Defendants' use of "scripts" when addressing customers to deceive them into believing that they were receiving professional services from AT&T when they were not;

(d) AT&T's representation to My24 that all professional services performed for the Broadcast Platform build out were being performed by AT&T or entities controlled by AT&T, when in fact those services were being performed by Verio, Genacom and various other entities;

(e) AT&T had developed and approved the processes utilized to construct the Broadcast Platform in accordance with professional standards and in keeping with a top tier company like AT&T; and

(f) individuals at AT&T with authority to approve investment in My24 had expressed interest in investing in My24 and that those individuals had expressed excitement about My24 as a company.

106.    Defendants made these representations with the intent to deceive My24, knowing that they were false, knowing that the subject professional services were not being performed by AT&T and that the appropriate individuals at AT&T had not expressed interest in investing in My24.

107.     Reasonably relying upon Defendants' fraudulent representations, Plaintiff engaged AT&T for the Broadcast Platform build out and other related professional services surrounding My24's launch and ceased its efforts to find partners and/or investors.

108.     But for the representations made by Defendants, Plaintiff would not have engaged AT&T to build the Broadcast Platform or subsequently enter into the Network Agreements after the completion of the Platform, and Plaintiff would not have ceased its efforts to find partners and equity investors.

109.     As a result of Plaintiff's reasonable reliance on Defendants' misrepresentations, Plaintiff has been damaged and continues to suffer damages.

110.     Plaintiff through its actions with Defendants has given sufficient notice of its rescission of the Network Agreements, but to remove any doubt Plaintiff hereby rescinds the Network Agreements on account of Defendants' fraud.

111.     In the alternative, Plaintiff was not required to notify Defendants of its rescission of the Network Agreements because Defendants have made restoration of Plaintiff to its pre-fraud position impossible and restoration to Plaintiff's pre-fraud position would be futile and unreasonable.

112.     Defendants acted with the specific intent to cause harm to Plaintiff, or acted with conscious indifference to the consequences of their actions and omissions, such that an award of punitive damages to punish, penalize, or deter the Defendants from committing similar actions in the future is justified. Because Defendants have acted with specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages. Plaintiff should be awarded punitive damages from the Defendants in an amount to be determined at trial according

to the enlightened conscience of the jury. Plaintiff is also entitled to recover its reasonable attorneys' fees from Defendants.

## COUNT II
## Fraudulent Inducement – Launch JV
## (Defendant AT&T)

113. Plaintiff repeats and re-alleges paragraphs 1 through 112, as if fully set forth herein.

114. For the purpose of procuring Plaintiff's money, AT&T, verbally and through written communications, represented that the professional services for which My24 was contracting were being performed by AT&T and that AT&T had agreed to the Launch JV.

115. Agents and representatives of Defendant AT&T accepted My24s' investment proposal on behalf of AT&T. In particular, on June 1, 2012 at the partnership meeting in Atlanta, Georgia, Blair Bardwell communicated AT&T's acceptance of My24's joint venture proposal on the condition that My24 agree to launch its platform during a Presidential Town Hall Meeting. My24 accepted AT&T's condition.

116. Bardwell and Pepe further represented that AT&T would sponsor the Presidential Town Hall Meeting and invest $27.2 million in My24 for the company's launch.

117. Defendant AT&T made these representations knowing that they were false, knowing that AT&T was not performing the subject professional services, and knowing that AT&T would not honor its obligations under the Launch JV.

118. Defendant made these false representations for the purpose of inducing My24 to contract for expensive professional services for the build out of the Broadcast Platform.

119. My24 reasonably relied on AT&T's false representations to its detriment.

120. But for the false misrepresentations made by AT&T, Plaintiff would not have engaged AT&T to build the Broadcast Platform or subsequently enter into the Network Agreements after the completion of the Platform, and Plaintiff would not have ceased its efforts to find partners and equity investors.

121.     Plaintiff affirms the Launch JV.

122.     As a result of Plaintiff's reliance on AT&T's fraudulent misrepresentations, Plaintiff has been damaged and continues to suffer damages.

123.     Defendant AT&T acted with the specific intent to cause harm to Plaintiff, or acted with conscious indifference to the consequences of its actions and omissions, such that an award of punitive damages to punish, penalize, or deter the Defendant from committing similar actions in the future is justified. Because Defendant has acted with specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages. Plaintiff should be awarded punitive damages from the Defendant in an amount to be determined at trial according to the enlightened conscience of the jury. Plaintiff is also entitled to recover its reasonable attorneys' fees from Defendant.

## COUNT III
### Breach of Joint Venture Agreement – Launch JV
### (Defendant AT&T)

124.     Plaintiff repeats and re-alleges paragraphs 1 through 123, as if fully set forth herein.

125.     My24 and AT&T agreed to enter into the Launch JV, pursuant to which AT&T and My24 agreed to combine their property and labor, AT&T agreed to build My24's Broadcast Platform and to fund My24's launch, and My24 agreed to launch My24 in conjunction with a Presidential Town Hall Meeting or Presidential Interview.

126.     AT&T and My24 entered into the Launch JV as a joint undertaking for profit. Pursuant to the Launch JV, My24 would receive substantial advertising revenues and substantial, lucrative brand recognition. AT&T would receive lucrative cross-marketing and co-branding rights which, among other things, would increase its NPS.

127. Pursuant to the Launch JV, My24 and AT&T had the joint right of control as to the launch of My24, including the details involved in launching My24 in conjunction with the Presidential Town Hall Meeting or during a Presidential Interview.

128. AT&T breached the Launch JV by refusing to fund My24's launch, refusing to sponsor the Presidential Town Hall Meeting or Presidential Interview, and holding My24's Broadcast Platform hostage.

129. My24 fully performed all of its duties under the Launch JV.

130. AT&T's breach of the Launch JV caused My24 to incur damages in an amount to be proven at trial.

**COUNT IV**
**Breach of Fiduciary Duty – Launch JV**
**(Defendant AT&T)**

131. Plaintiff repeats and re-alleges paragraphs 1 through 130, as if fully set forth herein.

132. As a joint venture partner pursuant to the Launch JV, AT&T owed My24 a fiduciary duty of loyalty and fair, open, and honest disclosure. In addition, AT&T owed My24 the duty to (a) cooperate with My24 and to exercise reasonable care and skill to effectuate the purposes for which AT&T and My24 had joined; (b) to not disrupt or abandon the venture for the purpose of obtaining benefits for itself; and (c) to not engage in any act which obstructs the carrying on of the joint venture's business to a successful conclusion.

133. AT&T breached its fiduciary duties to My24 by, among other things, (a) misrepresenting to My24 that it would fund the Launch JV, (b) abandoning the Launch JV for the purpose of obtaining benefits for itself, and (c) fraudulently inducing My24 to allow AT&T to develop the Broadcast Platform and its subsequent entry into the Network Agreements for AT&T's benefit, while simultaneously misrepresenting to My24 that AT&T would fund the Launch JV.

134.    AT&T's breach of fiduciary duties owed to My24 has caused My24 to incur damages in an amount to be proven at trial.

135.    Defendant AT&T acted with the specific intent to cause harm to Plaintiff, or acted with conscious indifference to the consequences of its actions and omissions, such that an award of punitive damages to punish, penalize, or deter the Defendant from committing similar actions in the future is justified. Because Defendant has acted with specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages. Plaintiff should be awarded punitive damages from the Defendant in an amount to be determined at trial according to the enlightened conscience of the jury. Plaintiff is also entitled to recover its reasonable attorneys' fees from Defendant. Plaintiff is entitled to all profits obtained by Defendant AT&T relating to or arising from AT&T's breach of its fiduciary duties to My24.

### COUNT V
### Promissory Estoppel – Launch JV
### (Defendant AT&T)

136.    Plaintiff repeats and re-alleges paragraphs 1 through 135, as if fully set forth herein.

137.    My24 pleads, in the alternative, that AT&T promised My24 that it would fund My24's launch via the Launch JV and sponsorship of the Presidential Town Hall Meeting or a Presidential Interview.

138.    AT&T should have reasonably expected My24 to rely on these promises, as AT&T knew that My24 was a technology start-up company dependent on AT&T's financial backing to launch its operations.

139.    My24 did, in fact, rely on AT&T's promises to its detriment.

140.    As a direct and proximate cause of Defendant's actions (as described herein) Plaintiff has been damaged, and continues to suffer damages, in an amount to be proven at trial.

141. Injustice can be avoided only by the enforcement of these promises because My24 surrendered the valuable right of obtaining financing and/or investment that would have allowed it to launch and compete in the multimedia marketplace.

## COUNT VI
### Fraudulent Inducement – Multimedia Expansion JV
### (Defendant AT&T)

142. Plaintiff repeats and re-alleges paragraphs 1 through 141, as if fully set forth herein.

143. For the purpose of procuring Plaintiff's money, AT&T, verbally and through written communications, represented that the professional services for which My24 was contracting were being performed by AT&T and that AT&T had agreed to invest $75 million in My24 for the purpose of its multimedia expansion.

144. Agents and representatives of Defendant AT&T accepted My24s' investment proposal on behalf of AT&T. In particular, on June 1, 2012 at the partnership meeting in Atlanta, Georgia, Mr. Bardwell communicated AT&T's acceptance of My24's joint venture proposal regarding its Multimedia expansion, which included, *inter alia*, expansion into sports, animation and movies.

145. AT&T made these representations knowing that they were false, knowing that the subject professional services were not being performed by AT&T, and knowing that AT&T would not honor its obligations under the Multimedia Expansion JV.

146. AT&T made these false representations for the purpose of inducing My24 to contract for expensive professional services for the build out of the Broadcast Platform.

147. My24 reasonably relied on Defendant's false representations to its detriment.

148.    But for the false representations made by AT&T, Plaintiff would not have entered into Multimedia Expansion JV, and would not have ceased its efforts to find partners and equity investors.

149.    As a result of Plaintiff's reliance on AT&T's misrepresentations, Plaintiff has been damaged and continues to suffer damages.

150.    Plaintiff nevertheless affirms the Multimedia Expansion JV.

151.    Defendant AT&T acted with the specific intent to cause harm to Plaintiff, or acted with conscious indifference to the consequences of its actions and omissions, such that an award of punitive damages to punish, penalize, or deter the Defendant from committing similar actions in the future is justified. Because Defendant has acted with specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages. Plaintiff should be awarded punitive damages from the Defendant in an amount to be determined at trial according to the enlightened conscience of the jury. Plaintiff is also entitled to recover its reasonable attorneys' fees from Defendant.

### COUNT VII
### Breach of Joint Venture Agreement – Multimedia Expansion JV
### (Defendant AT&T)

152.    Plaintiff repeats and re-alleges paragraphs 1 through 151, as if fully set forth herein.

153.    My24 and AT&T agreed to enter into the Multimedia Expansion JV.

154.    AT&T and My24 entered into the Multimedia Expansion JV as a joint undertaking for profit. Pursuant to this joint venture, My24 would receive AT&T's $75 million financial investment allowing My24 to expand its digital content offering into sports, animation, and movies.

155.     Pursuant to the Multimedia Expansion JV, My24 and AT&T had the joint right of control as to My24's content distribution, as AT&T was to be the exclusive provider of My24's digital content delivered through My24's Broadcast Platform.

156.     AT&T breached the Multimedia Expansion JV by refusing to make the $75 million investment and by holding My24's Broadcast Platform hostage.

157.     My24 fully performed all of its duties under the Multimedia Expansion JV.

158.     AT&T's breach of the Multimedia Expansion JV has caused My24 to incur damages in an amount to be proven at trial.

## COUNT VIII
### Breach of Fiduciary Duty –Multimedia Expansion JV
### (Defendant AT&T)

159.     Plaintiff repeats and re-alleges paragraphs 1 to 158, as if fully set forth herein.

160.     As a joint venture partner pursuant to the Multimedia Expansion JV, AT&T owed My24 a fiduciary duty of loyalty and fair, open, and honest disclosure. AT&T also owed My24 the duty: (a) to cooperate with My24 and to exercise reasonable care and skill to effectuate the purposes for which AT&T and My24 had joined; (b) to not disrupt or abandon the venture for the purpose of obtaining benefits for itself; and (c) to not engage in any act which obstructs the carrying on of the joint venture's business to a successful conclusion.

161.     AT&T breached its fiduciary duties to My24 by, among other things, (a) misrepresenting to My24 that it would fund the Multimedia Expansion JV, (b) abandoning the Multimedia Expansion JV for the purpose of obtaining benefits for itself, (c) fraudulently inducing My24 to allow AT&T to develop the Broadcast Platform and its subsequent entry into the Network Agreements for AT&T's benefit, while simultaneously misrepresenting to My24 that AT&T would fund the Multimedia Expansion JV; and (d) entering in contractual arrangements with third-parties

to provide services substantially similar to those contemplated under the Multimedia Expansion JV.

162. AT&T's breach of fiduciary duties owed to My24 has caused My24 to incur damages in an amount to be proven at trial.

163. Defendant AT&T acted with the specific intent to cause harm to Plaintiff, or acted with conscious indifference to the consequences of its actions and omissions, such that an award of punitive damages to punish, penalize, or deter the Defendant from committing similar actions in the future is justified. Because Defendant has acted with specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages. Plaintiff should be awarded punitive damages from the Defendant in an amount to be determined at trial according to the enlightened conscience of the jury. Plaintiff is also entitled to recover its reasonable attorneys' fees from Defendant. Plaintiff is entitled to all profits obtained by Defendant AT&T relating to, or arising from, AT&T's breach of its fiduciary duties to My24.

## COUNT IX
### Promissory Estoppel – Multi-Media Expansion JV
### (Defendant AT&T)

164. Plaintiff repeats and re-alleges paragraphs 1 to 163, as if fully set forth herein.

165. My24 pleads, in the alternative, that AT&T promised to invest $75 million into My24 for its multimedia expansion.

166. AT&T should have reasonably expected My24 to rely on these promises, as AT&T knew that My24 was a technology start-up company dependent upon AT&T's financial backing to launch its multimedia expansion.

167. My24 did, in fact, rely on AT&T's promises to its detriment.

168. As a direct and proximate cause of Defendant's actions (as described herein) Plaintiff has been damaged, and continues to suffer damages, in an amount to be proven at trial.

169. Injustice can be avoided only by the enforcement of these promises because My24 surrendered the valuable right of obtaining financing and/or investment that would have allowed it to launch and compete in the multimedia marketplace.

**COUNT X**
**Violation of Georgia Racketeer Influenced and**
**Corrupt Organizations Act, O.C.G.A. § 16-14-4(A)**
**(All Defendants)**

170. Plaintiff repeats and re-alleges paragraphs 1 through 169, as if fully set forth herein.

171. Defendants violated the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO"), O.C.G.A. §§ 16-14-1, *et seq.,* specifically including O.C.G.A. § 16-14-4(a), by acquiring and maintaining an interest in or control of money and/or property by engaging in a systematic and ongoing pattern of racketeering activity, including theft by deception and theft by taking. These crimes were committed to exact large sums of money and valuable property from Plaintiff and others like it for Defendants' pecuniary gain. Many of the crimes, as well as elements of other crimes, were committed in the State of Georgia, and many were targeted towards Georgia residents (like My24 at the relevant time) as well as residents of other states, giving Georgia a particular interest in this matter.

172. Defendants are persons within the meaning of O.C.G.A. § 16-14-4(a). In addition, Defendants' incidents of racketeering were orchestrated, performed and engaged in by Defendants by and through their employees who were acting within the scope of their employment and authorized by their manager(s) and top leaders while participating in the incidents of racketeering activity. Moreover, Defendants benefited from this criminal conduct.

173. Defendants obtained the property of Plaintiff and, upon information and belief, other victims by deceitful means and artful practices, with the intention of depriving the owners of said property. Defendants' theft by deception was committed by:

    (a) Defendants' creating or confirming its victim's impressions of existing facts or past events which were false and which Defendants knew to be false; and

    (b) Failing to correct false impressions of an existing fact or past event which Defendants had previously created or confirmed.

174. During the relevant times, and in furtherance of and for the purposes of defrauding Plaintiff and obtaining its property by fraud, willful misrepresentation, false pretenses or deception, Defendants on numerous occasions used, solicited and caused others to use deceitful means and artful practices with the intention of depriving Plaintiff, and others like it, many located in the State of Georgia, of its property by fraudulently inducing it to contract for services that Defendants knew to be fraudulent but that their victims, including Plaintiff, did not, specifically by making representations that intentionally created and/or confirmed impressions that:

    (a) Defendants' use of AT&T's brand and trade dress in its communications with My24– including use of e-mail formats (specifically, with My24, all e-mails between Underwood and Defendants in late 2011 and early 2012 using the e-mail addresses detailed in paragraph 34 *supra*) that were designed to make parties (like My24) believe that they were dealing with AT&T and not a third-party company;

    (b) Defendants' use of generic voicemail greetings that specifically did not mention the third-party company's name;

    (c) Defendants' use of "scripts" when addressing customers to deceive consumers into believing that they were receiving professional services from AT&T when they were not;

    (d) AT&T's representation to My24 that all professional services performed for the Broadcast Platform build out were being performed by AT&T or entities controlled by AT&T, when in fact those services were being performed by Verio, Genacom and various other entities;

(e) AT&T had developed and approved the processes utilized to construct the Broadcast Platform in accordance with professional standards and in keeping with a top tier Company like AT&T; and

(f) Individuals at AT&T with authority to approve investment in My24 had expressed interest in investing in My24 and that those individuals had expressed excitement about My24 as a company.

175.    Defendants made these representations, creating and/or confirming the impressions contained in the preceding paragraph, even though Defendants knew or believed at the time of the representations that such statements were false and incorrect.

176.    Defendants made these representations, creating and confirming these impressions, to induce Plaintiff and other similarly situated individuals to purchase professional services so that Defendants could obtain large fees from services sold to its victims and tied to the sale of these services, obtain profits from increased data charges associated with Plaintiff's technology, and so Defendants could misappropriate Plaintiff's trade secrets.

177.    Defendants continued making fraudulent representations and/or confirming false impressions that it had previously created to induce Plaintiff and other similarly situated individuals to continue providing money and valuable property to AT&T for the type of professional services involved under the Network Agreements.

178.    Despite having numerous opportunities to do so, Defendants failed to correct the false impressions described above that Defendants had previously created or confirmed. Instead, Defendants affirmatively concealed their wrongful actions from their victims, including Plaintiff.

179.    As an additional part of their fraudulent scheme to obtain the property of Plaintiff and other victims, and to prevent their victims from acquiring information pertinent to the disposition of the property involved, Defendants intentionally withheld information regarding

Defendants Verio and Genacom's identity and AT&T's then present intentions regarding investment with My24 as follows:

> (a) that during 2011 and 2012 Verio and Genacom were using AT&T's brand and trade dress to actively deceive customers into believing that they were dealing with AT&T;
>
> (b) that during 2011 and 2012 Verio and Genacom, for the purpose of baiting customers into using the subject professional services and parting with their property, were actively discussing AT&T investments and joint ventures with those customers;
>
> (c) that AT&T professional and legal compliance personnel were advising and assisting Verio and Genacom representatives on how best to deceive customers like My24 into purchasing the subject professional services;
>
> (d) AT&T employees, including those in Georgia and others who travelled to Georgia - including but not limited to meetings that took place in Atlanta Georgia on May 31, 2012 and June 1, 2012 - actively took steps to conceal the fact that they had not sought approval from the appropriate individuals at AT&T regarding investment in My24 and in fact that the appropriate individuals at AT&T had not approved joint ventures with My24; and
>
> (e) that the prospect of joint venturing with and/or sponsoring My24 for its launch and multimedia expansion was used as bait to induce My24 into using as many of AT&T's professional services as possible.

180.     Defendants concealed the true facts and failed to correct the false impressions regarding Defendants' professional services schemes they created in their victim until after they had completed the Broadcast Platform build out by providing misleading and false information to My24 privately and in the public realm, with full knowledge that Defendants' victim would rely upon their misstatements.

181.     To perpetuate their fraudulent scheme to obtain the property of Plaintiff and other victims, to prevent their victims from acquiring information pertinent to the disposition of the property involved, and to confirm their victims' false impressions, Defendants, directly and

through their agents, through communication to and while physically here in Georgia engaged in the below improper acts:

(a) AT&T did actively deceive and instruct Defendants Verio and Genacom to actively deceive customers like My24 into believing that it was dealing with AT&T; and

(b) Defendants provided false or misleading information to My24 (and continues to provide, on information and belief, such information to customers like My24) regarding the possibility that AT&T may invest in its company for the purpose of keeping the customer engaged and deceiving it into purchasing expensive professional services;

182. This conduct constitutes theft by deception in violation of O.C.G.A. § 16-8-3 and constitutes an act of racketeering activity under Georgia RICO, O.C.G.A. § 16-14-3(5)(A)(xii). By committing, attempting to commit, and soliciting and causing others to commit theft by deception, Defendants proximately caused injuries to Plaintiff and other victims like it. Additional details of these thefts are in the possession of Defendants and others and await discovery.

183. This conduct also constitutes theft by taking in violation of O.C.G.A. § 16-8-2, an act of racketeering activity under Georgia RICO, O.C.G.A. § 16-14-3(5)(A)(xii), by unlawfully taking, or being in lawful possession thereof, unlawfully appropriating the property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated. By committing, attempting to commit and soliciting and causing others to commit theft by taking, Defendants proximately caused injuries to Plaintiff and other victims like it. Additional details of these thefts are in the possession of Defendants and others and await discovery.

184. As set forth herein, during the relevant times and in furtherance of and for the purpose of executing the scheme and artifice to defraud, Defendants on numerous occasions engaged in acts involving theft chargeable under the laws of the several states, including Georgia,

and punishable by imprisonment for more than one year. Specifically, Defendants engaged in such thefts and solicited and caused others to engage in such thefts. This conduct constitutes racketeering activity under the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-3(5)(B). These acts involving theft and the thefts were a substantial factor in the sequence of proximate causation; and the injuries that Plaintiff and other victims like it suffered by reason thereof were reasonably foreseeable or anticipated as a natural consequence of these thefts. Additional details of these thefts are in possession of Defendant and others and await discovery.

185.     Each time Defendants sold or attempted to sell professional services by deceiving customers about the identity of the entity who would be performing the subject professional services, misrepresenting their origin and falsely holding out the possibility of investment in the customer by AT&T, it engaged in an individual act of theft by deception, theft by taking, and/or grand theft.

186.     Moreover, Defendants' thefts by deception and theft by taking were accomplished by taking money and economic opportunity from Defendants' victims, such as My24, to obtain what Defendants knew (but their victims did not know) were professional services from a company other than AT&T, without the possibility that AT&T would ever invest into their respective ventures.

187.     Upon information and belief, Defendants' thefts by deception and thefts by taking were practiced against multiple victims, both inside and out of Georgia, including but not limited to Plaintiff whose identities are known by Defendants and await discovery.

188.     Defendants' acts of theft by deception and theft by taking were undertaken in and involved Georgia by, among other things, coordinating and negotiating statements of work and

ultimately executing the Network Agreements with Plaintiff which maintained its principal place of business in Georgia at the time and participating in a partnership meeting in Atlanta, Georgia in May and June of 2012 where, in furtherance of its acts of theft by deception and theft by taking, AT&T representatives misrepresented to My24 that AT&T had agreed to invest $102 million into My24 and also sponsor My24's launch via a Presidential Town Hall Meeting or Presidential Interview.

## Defendants' Pattern of Racketeering Activity

189.    Defendants' participation in these incidents of racketeering activity constitutes a pattern of racketeering activity as defined by O.C.G.A. § 16-14-3(4) which pattern included theft by taking, the solicitation of theft by taking, theft by deception and the solicitation of theft by deception in violation of Georgia law, all of which constitutes racketeering activity under O.C.G.A. § 16-14-3(5)(A) and (B).

190.    The pattern of racketeering activity took place from 2011 to 2014 when Defendants developed, promoted, and implemented deceptive and fraudulent practices around its sale and promotion of professional services under the AT&T banner and began to deceive customers like My24 into believing that AT&T would invest in their business for the purpose deriving revenue from the sale of said professional services.

191.    As part of the pattern of racketeering activity, Defendants attempted to convince companies with novel and potentially valuable concepts, like My24, to purchase professional services.

192.    Upon information and belief, Defendants told each of these customers that the professional services it was purchasing were being provided by AT&T.

193.    Upon information belief, Defendants would then organize meetings, conferences and communications among each AT&T client and representatives of Defendants who were working on the AT&T "team" to provide the subject professional services.

194.    At these meetings, Defendants' representatives and other business professionals discussed the various ways AT&T could support and promote their business objectives, including equity investments, when in reality Defendants were merely trying to generate as much revenue as possible by duping the customer into contracting for multiple professional services and dangling the possibility of a joint venture with AT&T as bait.

195.    At these meetings and via subsequent communications, AT&T repeatedly asserted to its victims that AT&T was providing the professional services for which it had contracted and that AT&T would sponsor, invest in, and/or partner with such entities on their ventures.  AT&T's representations were false because Defendants knew that the subject services were being provided by companies other than AT&T, and that the appropriate individuals at AT&T had not agreed to sponsor, invest in, and/or partner with their victims on their ventures, nor had those individuals expressed interest in sponsoring, investing in, and/or partnering with their victims on their ventures.

196.    Despite their knowledge that victims like My24 would be attracted to the possibility that AT&T would invest in its business, Defendants nonetheless deceived customers as to the origin of the professional services for which it was contracting and for the purpose of extracting fees and other valuable property from customers.

197.    Defendants knew or should have known that technology start-ups like My24 would rely to their detriment on misrepresentations by AT&T regarding AT&T's intent to invest in their business and, as a result, these start-ups would miss the opportunity to secure real investments

from viable financing sources and introduce their valuable concepts into commerce in time to maximize their commercial value

198.    Defendant AT&T, in fact, knew that its deception was critical to secure the engagement for the build out of My 24's Broadcast Platform and to generate a variety of ancillary professional services relating thereto. Accordingly, AT&T through its aggressive sales team promoted a culture that would offer any representation it viewed as necessary to secure and profit from a customer.

199.    On information and belief, each time AT&T billed, engaged in activities wherein it attempted to collect, and/or accepted money from My24 or victims like it, Defendants engaged in a specific act of racketeering activity constituting an attempted theft, an act involving theft or a completed theft.

200.    All acts of racketeering activity had the same or similar intent, specifically to acquire money and/or property from Plaintiff and other AT&T clients through a pattern of racketeering activity.

201.    Defendants' acts of racketeering activity had the same or similar objective and/or results, with the result being acquiring money and/or valuable property for Defendants

202.    Defendants' acts of racketeering activity had the same or similar victims, including start-up technology firms like Plaintiff, entrepreneurs like Mr. Underwood, and others like them.

203.    Defendants' acts of racketeering activity had the same or similar methods of commission in that those acts relied upon fraudulent misrepresentations and omissions.

204.    Defendants accepted and retained the benefits of the incidents of racketeering activity and resulting pattern of racketeering activity which was committed by employees,

managers and executives of Defendants on behalf of their respective companies, thereby ratifying this conduct.

205. Defendants' acts of racketeering activity were otherwise related by distinguishing characteristics including, but not limited to, deception surrounding the use of AT&T's brand, misleading information regarding the origin of the subject professional services, and deception about AT&T's interest in investing with the subject victim.

206. Plaintiff suffered damages as a result of Defendants' violations of Georgia RICO in an amount to be proven at trial.

207. Pursuant to O.C.G.A. § 16-14-6 (c), Plaintiff is entitled to recover three times its actual damages, its attorneys' fees, and the costs of investigation and litigation.

208. The wrongful actions of Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, rendering Defendants liable to Plaintiff for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

209. Because Defendants acted with specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

**COUNT XI**
**Conspiracy to Violate Georgia RICO,**
**O.C.G.A. § 16-14-4 (c)**
**(All Defendants)**

210. Plaintiff repeats and re-alleges paragraphs 1 through 209, as if fully set forth herein.

211. AT&T conspired with others, including but not limited to Defendants Verio and Genacom and others, known and unknown, to violate O.C.G.A. § 16-14-4 (a), in violation of O.C.G.A. § 16-14-4 (c).

212. The pattern of racketeering activity contemplated by, and committed pursuant to, the conspiracy consisted of the acts of racketeering activity set forth above.

213. AT&T, Verio and Genacom, and others committed overt acts, which are also acts of racketeering activity, in furtherance of the conspiracy, including but not limited to those described below.

214. Verio committed overt acts in furtherance of the conspiracy by coordinating with AT&T and Genacom on the best way to deceive customers into believing that they were purchasing professional services from AT&T.

215. Genacom committed overt acts in furtherance of the conspiracy by coordinating with AT&T and Verio on the best way to deceive customers into believing that they were purchasing professional services from AT&T.

216. AT&T committed overt acts in furtherance of the conspiracy by coordinating with Verio and Genacom on the best way to deceive customers into believing that they were purchasing professional services from AT&T.

217. Verio committed overt acts in furtherance of the conspiracy by deceiving My24 into believing that it had contracted with AT&T to provide the subject professional services, and leading My24 to believe that AT&T would invest in it when in fact AT&T had not agreed to invest and the prospect of such investment was mentioned only for the purposes of deceiving My24 into purchasing expensive professional services and parting with valuable property.

218. AT&T committed overt acts in furtherance of the conspiracy by allowing and actively assisting Verio and Genacom with exploitation of its brand for the purpose of enticing customers like My24 to, *inter alia*, purchase expensive professional services and part with valuable property.

219.     Defendants committed overt acts in furtherance of conspiracy by sending false and misleading communications to My24, which falsely stated that the subject professional services were being performed by AT&T, that AT&T was interested in, and ultimately had agreed to, invest in My24, when Defendants knew such statements to be false.

220.     Verio and Genacom, acting in concert with AT&T, committed overt acts in furtherance of the conspiracy by procuring deceptive and misleading e-mail addresses and generating deceptive and misleading telephone greetings that were intended to deceive customers like My24 into believing that they were contracting with AT&T, when Verio and Genacom knew that customers like My24 would in fact be deceived by these tactics.

221.     AT&T committed overt acts in furtherance of the conspiracy by actively encouraging Verio and Genacom to engage in behavior intended to deceive customers like My24 into purchasing the subject professional services and parting with valuable property.

222.     AT&T committed overt acts in furtherance of the conspiracy by representing to third-parties that AT&T had agreed to invest in and fund My24.

223.     Defendants' participation in the predicate acts described above and the overt acts described above demonstrate that the Defendants agreed to deceive and defraud Plaintiff and other clients in order to profit from the sale of the subject professional services and by gaining access to Plaintiff's valuable intellectual property.

224.     Defendants' actions constitute willful misconduct, malice, fraud, wantonness, oppression and an entire want of care that would raise the presumption of conscious indifference to the consequences, and specific intent to cause harm, entitling Plaintiff to recover punitive damages sufficient to deter the misconduct.

## COUNT XII
## Violation of Georgia Unfair and Deceptive
## Trade Practices Act, O.C.G.A. § 10-1-372
## (All Defendants)

225.    Plaintiff repeats and re-alleges paragraphs 1 through 224, as if fully set forth herein.

226.    Plaintiff chose AT&T to provide the professional services at issue for its business needs and thereby suffered ascertainable losses as a result of Defendants' actions in violation of Georgia's consumer protection laws.

227.    Had Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have allowed them to build out the Broadcast Platform, would not have contracted for the related subject professional services, would not have relied on Defendants' numerous misrepresentations, and would not have incurred related damages.

228.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, valuable business from Plaintiff - business that Plaintiff would not have awarded to Defendants had they not engaged in unfair and deceptive conduct.

229.    Defendants' unfair methods of competition or deceptive acts or practices that were proscribed by law, include the following:

   a.   passing the subject professional services off as those of AT&T when they were not;

   b.   causing a likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of the subject professional services by representing to Plaintiff that services had characteristics, uses benefits or the backing and/or involvement from entities that they did not have;

   c.   causing a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the subject professional services;

   d.   representing that the subject professional services had sponsorship, approval, characteristics and benefits that they did not have;

e. representing that Defendant Verio and Defendant Genacom's representatives had approval, status, affiliation and connections with AT&T that they didn't have; and

f. engaging in fraudulent or deceptive conduct that created a likelihood of confusion or misunderstanding, e.g. creating misleading e-mail formats for the purpose of deceiving consumers like Plaintiff into believing that they were contracting with AT&T.

230. Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct directed at consumers like Plaintiff was to deceive consumers into believing that they were contracting with AT&T and all that AT&T's brand and resources brought with such affiliation.

231. Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the provision of the subject professional services.

232. Had Defendants not engaged in the deceptive conduct described above, Plaintiff would not have allowed them to build out the Broadcast Platform, would not have contracted for the related subject professional services, would not have believed that AT&T had agreed to invest in its business, nor would Plaintiff had cease its efforts to find other investors and partners.

233. Defendants' deceptive, unconscionable, fraudulent representations and material omissions to Plaintiff, and upon information and belief, to other consumers, constituted unfair and deceptive acts and trade in violation of O.C.G.A. §§ 10-1-372 *et. seq.*

234. Defendants have engaged in unfair competition or unfair and/or deceptive acts or trade practices and have made false representations in violation of O.C.G.A. §§ 10-1-372 *et. seq.*

235. Under the above-referenced statute (designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising),

Defendants are suppliers, manufacturers, advertisers, and sellers, who are subject to liability under such legislation for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

236.   By reason of Defendants' unlawful acts, and as a direct and proximate result thereof, Plaintiff has suffered ascertainable losses and damages.

237.   As a direct and proximate result of Defendants' violations of Georgia's consumer protection laws, Plaintiff has sustained economic losses and other damages and is entitled to statutory and compensatory, damages in an amount to be proven at trial.

## COUNT XIII
## Breach of Contract - NDA
## (Defendant AT&T)

238.   Plaintiff repeats and re-alleges paragraphs 1 through 237, as if fully set forth herein.

239.   AT&T and My24 entered into the NDA.

240.   Under the terms of the NDA, AT&T and My24 agreed that "Confidential Information" included, *inter alia*, pricing and financial data, network designs and design proposals, analyses, proposals, business plans, forecasts, plans and specifications of any product or service, drawings, models, software, and prototypes.

241.   On information and belief, AT&T breached the NDA by, *inter alia*, disclosing to third-parties vital elements of My24's Business Plan and novel ideas associated with the Broadcast Platform and its related intellectual property to third-parties including, but not limited to, in conjunction with AT&T's acquisition of DirectTV and its proposed merger with Time Warner. These elements and novel ideas constitute "Confidential Information" under the NDA.

242.   Plaintiff has honored all of its obligations under the NDA.

243.   AT&T's breach of the NDA has caused Plaintiff to incur damages in an amount to be proven at trial.

**COUNT XIV**
**Violation of the Defend Trade Secrets Act – 18 U.S.C. § 1836(b)**
**(Defendant AT&T)**

244.    Plaintiff repeats and re-alleges paragraphs 1 through 243, as if fully set forth herein.

245.    In conjunction with My24's selection of AT&T to develop its novel Broadcast Platform, My24 provided AT&T with valuable and confidential trade secrets necessary to complete the build out.  These trade secrets include, but are not limited to, the backend specifications for the platform, such as confidential technical notes and detailed data specifications - all of which were essential for the development of the Broadcast Platform.

246.    Additionally, in connection with the AT&T/My24 joint ventures, My24 provided AT&T with additional confidential trade secrets in the form of its novel Business Plan.  The Business Plan provides the vehicle for the profitable implementation and operation of the Broadcast Platform for the benefit of My24 and AT&T. The Business Plan detailed, *inter alia*, the unique qualities of the My24 Broadcast Platform and its corresponding attractiveness to the market and consumers; market analytics and research regarding the platform and end users; advertising, marketing and branding plans for AT&T using the platform; as well as projected revenues from the platform.

247.    The information provided to AT&T in connection with, or as a part of, the Broadcast Platform and/or Business Plan is unique to My24 and derives its value from not being commonly known or available to the public.

248.    My24 takes reasonable steps to protect the secrecy of the confidential, proprietary and trade secret information relating to the Broadcast Platform and the Business Plan, including requiring third-parties seeking access to the information to execute a nondisclosure agreement with My24. AT&T executed the NDA covering both the Broadcast Platform and Business Plan trade

secrets. In addition, all third-parties that attended the two-day partnership/investment meeting between AT&T and My24 in Atlanta (which included detailed discussions of the Broadcast Platform and Business Plan) executed a nondisclosure agreement regarding the above-referenced trade secrets. My24 employed these steps to maintain the secrecy of the trade secret information provided to AT&T in conjunction with the development of the Broadcast Platform and the Parties' joint ventures.

249.    My24's trade secrets relate to the implementation and operation of the Broadcast Platform intended for use in interstate and foreign commerce.

250.    Notwithstanding My24's efforts to maintain the confidentiality of its trade secrets, upon information and belief, AT&T has misappropriated those valuable trade secrets intended for use in interstate and foreign commerce.

251.    Upon information and belief, following receipt of My24's confidential trade secrets, AT&T (i) disclosed such information to various third-parties including, but not limited to, representatives of Time Warner in conjunction with AT&T's proposed acquisition of Time Warner, and/or third-parties involved with those transactions, or other transactions entered into, or contemplated to be entered into, by AT&T; and (ii) utilized this information in its business for the unlawful economic benefit of AT&T and to the detriment of My24.

252.    AT&T knew and/or had reason to know that the above-referenced disclosures and utilization of information were improper, as it specifically owed My24 a duty to keep the trade secrets confidential and limit the use of such information to the purposes expressly agreed to by My24 and AT&T pursuant to the NDA.

253.    The confidential and proprietary trade secret information misappropriated by AT&T derives independent economic value from not being generally known to or ascertainable by

proper means by others who could obtain economic benefit from disclosure, use and/or replication of such information. This lack of knowledge among third-parties made My24 unique and gave it a competitive edge in the multimedia market place.

254. The information misappropriated by AT&T constitutes trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et. seq*.

255. AT&T's misappropriation of My24's trade secrets gave and continues to give AT&T an unfair and unjust advantage in the operation of a business that would be a competitor of My24.

256. Upon information and belief, AT&T has improperly utilized My24's misappropriated trade secrets to assist its expansion from an entity focused almost exclusively on telecommunications - as was the case in the summer of 2011 when it first received certain of My24's trade secret information – to an entity heavily involved in the multimedia technology sector.

257. Upon information and belief, AT&T continues to unlawfully use and disclose My24's trade secret information.

258. The use and disclosure, and even threatened use and disclosure, of My24's trade secrets by AT&T entitles My24 to immediate injunctive relief and damages pursuant to 18 U.S.C. § 1836(b)(3).

259. At all material times, AT&T has acted willfully, maliciously, and in bad faith. Defendant acted with the specific intent to cause harm to Plaintiff, or acted with conscious indifference to the consequences of its actions and omissions, such that an award of punitive damages to punish, penalize, or deter the Defendant from committing similar actions in the future

is justified. Plaintiff should be awarded punitive damages from AT&T in an amount to be determined at trial according to the enlightened conscience of the jury.

260.     My24 has suffered and will continue to suffer irreparable harm as a result of AT&T's misappropriation.

**COUNT XV**
**Misappropriation of Trade Secrets**
**Georgia Trade Secrets Act - O.C.G.A. § 10-1-760 *et. seq.***
**(Defendant AT&T)**

261.     Plaintiff repeats and re-alleges paragraphs 1 through 260, as if fully set forth herein.

262.     In conjunction with My24's selection of AT&T to develop its novel Broadcast Platform, My24 provided AT&T with valuable and confidential trade secrets necessary to complete the build out.  These trade secrets include, but are not limited to, the backend specifications for the platform, such as confidential technical notes and detailed data specifications - all of which were essential for the development of the Broadcast Platform.

263.     Additionally, in connection with the AT&T/My24 joint ventures, My24 provided AT&T with additional confidential trade secrets in the form of its novel Business Plan.  The Business Plan provides the vehicle for the profitable implementation and operation of the Broadcast Platform for the benefit of My24 and AT&T. The Business Plan detailed, *inter alia*, the unique qualities of the My24Broadcast Platform and its corresponding attractiveness to the market and consumers; market analytics and research regarding the platform and end users; advertising, marketing and branding plans for AT&T using the platform; as well as projected revenues from the platform.

264.     The information provided to AT&T in connection with, or as a part of, the Broadcast Platform and/or Business Plan is unique to My24 and derives its value from not being commonly known or available to the public.

265.     My24 takes reasonable steps to protect the secrecy of the confidential, proprietary and trade secret information relating to the Broadcast Platform and the Business Plan, including requiring third-parties seeking access to the information to execute a nondisclosure agreement with My24.  Importantly, AT&T executed a NDA covering both the Broadcast Platform and Business Plan trade secrets. Additionally, all third-parties that attended the two-day partnership/investment meeting between AT&T and My24 in Atlanta (which included detailed discussions of the Broadcast Platform and Business Plan) executed a nondisclosure agreement regarding the above-referenced trade secrets.  My24 employed these steps to maintain the secrecy of the trade secret information provided to AT&T in conjunction with the development of the Broadcast Platform and the Parties' joint venture.

266.     My24's trade secrets relate to products and or services intended for use in interstate and foreign commerce.

267.     Notwithstanding My24's efforts to maintain the confidentiality of its trade secrets, upon information and belief, AT&T has misappropriated those valuable trade secrets.

268.     Upon information and belief, following receipt of My24's confidential trade secrets, AT&T (i) disclosed such information to various third-parties including, but not limited to, representatives of DirecTV (prior to AT&T's acquisition of DirecTV) and Time Warner in connection with AT&T's proposed acquisition of Time Warner, and/or third-parties involved with those transactions; and (ii) utilized such information in its business for the unlawful economic benefit of AT&T and to the detriment of My24.

269.     AT&T knew and/or had reason to know that the above-referenced disclosures and utilization of information were improper, as it specifically owed My24 a duty to keep the trade

secrets confidential and limit the use of such information to the purposes expressly agreed to by the Parties under the NDA.

270.    The confidential and proprietary trade secret information misappropriated by AT&T derives independent economic value from not being generally known to or ascertainable by proper means by others who could obtain economic benefit from disclosure, use and/or replication of such information. This lack of knowledge among third-parties made My24 unique and gave it a competitive edge in the multimedia market place

271.    The information misappropriated by AT&T constitutes trade secrets under the Georgia Trade Secrets Act, O.C.G.A. § 10-1-761.

272.    AT&T's misappropriation of My24's trade secrets gave and continues to give AT&T an unfair and unjust advantage in the operation of a business that would be a competitor of My24.

273.    Upon information and belief, AT&T has improperly utilized My24's misappropriated trade secrets to assist its expansion from an entity focused almost exclusively on telecommunications - as was the case in the summer of 2011 when it first received certain of My24's trade secret information – to an entity heavily involved in the multimedia technology sector.

274.    Upon information and belief, AT&T continues to unlawfully use and disclose My24's trade secret information.

275.    The use and disclosure, and even threatened use and disclosure, of My24's trade secrets by AT&T entitles My24 to immediate injunctive relief and damages pursuant to O.C.G.A. § 10-1-762.

276. At all material times, AT&T has acted willfully, maliciously, and in bad faith. Defendant acted with the specific intent to cause harm to Plaintiff, or acted with conscious indifference to the consequences of its actions and omissions, such that an award of punitive damages to punish, penalize, or deter the Defendant from committing similar actions in the future is justified. Because Defendant has acted with specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages. Plaintiff should be awarded punitive damages from AT&T in an amount to be determined at trial according to the enlightened conscience of the jury.

277. My24 has suffered and will continue to suffer irreparable harm as a result of AT&T's misappropriation.

## COUNT XVI
## Unjust Enrichment
## (Defendant AT&T)

278. Plaintiff repeats and re-alleges paragraphs 1 through 277, as if fully set forth herein.

279. AT&T has retained My24's Broadcast Platform and intellectual property associated therewith.

280. AT&T has been unjustly enriched as a result of its unjust retention of My24's Broadcast Platform and intellectual property associated therewith.

281. As a proximate result of AT&T's unjust enrichment, My24 has suffered damages in an amount to be proven at trial.

## COUNT XVII
## Conversion
## (Defendant AT&T)

282. Plaintiff repeats and re-alleges paragraphs 1 through 281, as if fully set forth herein.

283. Plaintiff had the right of possession of the Broadcast Platform and intellectual property associated therewith.

284. AT&T has actual possession of My24's Broadcast Platform and intellectual property associated therewith.

285. Plaintiff has demanded that AT&T return to My24 the Broadcast Platform and intellectual property associated therewith.

286. AT&T has refused to return to My24 the Broadcast Platform and intellectual property associated therewith.

287. As a proximate result of AT&T's conversion, My24 has suffered damages in an amount to be proven at trial.

288. Defendant acted with the specific intent to cause harm to Plaintiff, or acted with conscious indifference to the consequences of its actions and omissions, such that an award of punitive damages to punish, penalize, or deter the Defendant from committing similar actions in the future is justified. Because Defendant has acted with specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages. Plaintiff should be awarded punitive damages from AT&T in an amount to be determined at trial according to the enlightened conscience of the jury.

### COUNT XVIII
### Fraud
### (All Defendants)

289. Plaintiff repeats and re-alleges paragraphs 1 through 288, as if fully set forth herein.

290. Defendants supplied false information to My24, a technology start-up company, whom Defendants knew or should have known would rely upon such information, including, but not limited to: (a) that AT&T was providing the professional services for the Broadcast Platform

build out; (b) that AT&T would invest in Plaintiff for funding of its Broadcast Platform build out; (c) that AT&T would fund My24's launch; (d) that AT&T would financially invest so that My24 could expand its digital content offering into, *e.g.*, sports, animation, and movies; (e) that it was important to AT&T that it exclusively provide the My24 Content Delivery Network, (f) that it was important to AT&T that My24 expand its multi-media content; (g) that My24's expansion would provide AT&T lucrative co-branding and co-marketing opportunities; (h) that My24's Broadcast Platform would allow AT&T to assess its customers substantial premium data charges for the use of the digital content generated from the platform; and (i) that My24 would allow AT&T to substantially increase its NPS.

291.    Defendants intended to deceive My24.

292.    Plaintiff justifiably relied on these representations by exclusively using AT&T to develop the build out of the Broadcast Platform and by ceasing efforts to find other investors and/or business partners.

293.    As a proximate result of its reliance, Plaintiff has suffered damages in an amount to proven at trial.

294.    Defendants acted with the specific intent to cause harm to Plaintiff, or acted with conscious indifference to the consequences of its actions and omissions, such that an award of punitive damages to punish, penalize, or deter the Defendants from committing similar actions in the future is justified. Because Defendants have acted with specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages. Plaintiff should be awarded punitive damages from Defendants in an amount to be determined at trial according to the enlightened conscience of the jury

## COUNT XIX
## Negligent Misrepresentation
## (All Defendants)

295.     Plaintiff repeats and re-alleges paragraphs 1 through 293, as if fully set forth herein.

296.     Defendants negligently supplied false information to My24, a technology start-up company, whom Defendants knew or should have known would rely upon such information, including, but not limited to: (a) that AT&T was providing the professional services for the Broadcast Platform build out; (b) that AT&T would invest in Plaintiff for funding of its Broadcast Platform build out; (c) that AT&T would fund My24's launch; (d) that AT&T would financially invest so that My24 could expand its digital content offering into, *e.g.*, sports, animation, and movies; (e) that it was important to AT&T that it exclusively provide the My24 Content Delivery Network, (f) that it was important to AT&T that My24 expand its multi-media content; (g) that My24's expansion would provide AT&T lucrative co-branding and co-marketing opportunities; (h) that My24's Broadcast Platform would allow AT&T to assess its customers substantial premium data charges for the use of the digital content generated from the platform; and (i) that My24 would allow AT&T to substantially increase its NPS.

297.     Plaintiff justifiably relied on these representations by exclusively using AT&T to develop the build out of the Broadcast Platform and by ceasing efforts to find other investors and/or business partners.

298.     As a proximate result of its reliance, Plaintiff has suffered damages in an amount to proven at trial.

299.     Defendants acted with the specific intent to cause harm to Plaintiff, or acted with conscious indifference to the consequences of its actions and omissions, such that an award of punitive damages to punish, penalize, or deter the Defendants from committing similar actions in

the future is justified. Because Defendants have acted with specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages. Plaintiff should be awarded punitive damages from Defendants in an amount to be determined at trial according to the enlightened conscience of the jury.

## CLAIM XX
### Permanent Injunctive Relief
### (Defendant AT&T)

300. Plaintiff repeats and re-alleges paragraphs 1 through 299, as if fully set forth herein.

301. Plaintiff seeks permanent injunctive relief enjoining AT&T from using, directly or indirectly, My24's novel ideas (including the use of the ideas described in My24's Business Plan), Broadcast Platform, and associated intellectual property, and requiring AT&T to return the Broadcast Platform and associated intellectual property to My24.

302. Plaintiff can show likelihood of success, and actual success, on the merits.

303. Plaintiff will suffer irreparable harm in the absence of a permanent injunction.

304. The balance of equities tips in My24's favor.

305. The requested injunctive relief will serve the public interest

## COUNT XXI
### Attorneys Fees Pursuant to O.C.G.A. § 13-6-11
### And Pre-Judgment Interest
### (Defendants)

306. Plaintiff repeats and re-alleges paragraphs 1 through 305, as if fully set forth herein.

307. Defendants acted in bad faith and caused Plaintiff unnecessary trouble and expense.

308. Accordingly, Plaintiff should recover its expenses of litigation, including its reasonable attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

309. Plaintiff is entitled to prejudgment interest on all damages.

## COUNT XXII
## Punitive Damages
## (Defendants)

310.     Plaintiff repeats and re-alleges paragraphs 1 through 309, as if fully set forth herein.

311.     The tortious conduct described herein was committed by Defendants, and each of them, intentionally, willfully, maliciously, wantonly, and with utter disregard to the consequences to Plaintiff. Such intentional acts by Defendants have resulted in significant damages to Plaintiff. Because Defendants have acted with specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

312.     In addition to full compensatory damages and all other relief sought herein, Plaintiff is entitled to an award of punitive damages against Defendants, and each of them, in an amount to be determined by the enlightened conscience of the jury sufficient to deter Defendants from engaging in such conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment as follows:

A.     That the Court award Plaintiff damages on all counts in an amount of at least $1.875 billion;

B.     That Plaintiff recover prejudgment interest;

C.     That Plaintiff recover punitive damages pursuant to O.C.G.A. § 51-12-5.1;

D.     That Plaintiff recover its costs and reasonable attorneys' fees pursuant to O.C.G.A. § 13-6-11

E.     That Plaintiff recover three times their actual damages, their attorneys' fees, and the costs of investigation and litigation pursuant to O.C.G.A. § 16-14-6(C); and

F.     That this Court award Plaintiff such other and further relief as may be just and proper.

**DEMAND FOR JURY DEMAND**

PLAINTIFF DEMANDS A TRIAL BY JURY.

DUBOSE MILLER LLC

By: /s/ Von A. DuBose
Von A. DuBose
Georgia Bar Number 231451
Tanya F. Miller
Georgia Bar Number 508434
75 14th Street N.E., Suite 2110
Atlanta, Georgia 30309
Telephone: (404) 720-8111
Facsimile: (404) 921-9557

-and-

Scott A. Griffin
Michael D. Hamersky
GRIFFIN HAMERSKY LLP
420 Lexington Avenue, Suite 400
New York, New York 10170
Telephone: (646) 998-5580
Facsimile:  (646) 998-8284

*Counsel for My24HourNews.Com, Inc.*