# Exhibit I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 15-cv-01210–RM–NYW

**My24HourNews.Com, Inc.,**
a Colorado corporation,

     Plaintiff,

v.

**AT&T Corp.,** a New York corporation**,** and
**AT&T, Inc.,** a Delaware corporation**,**

     Defendants.

_____

### FIRST AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL
_____

Plaintiff My24HoursNews.Com, Inc. ("My24"), for its First Amended Complaint for Damages, Injunctive Relief, and Demand for Jury Trial against AT&T Corp. and AT&T Inc. (collectively referred to herein as "AT&T"), alleges as follows:

### NATURE OF THIS ACTION

1.     My24 designed a novel, cutting edge, technical schematic of a backend digital platform ("Broadcast Platform") which would allow My24 to deliver, on demand and by customer preference, its interactive live video digital news content to Smartphones and Tablets, and other Internet mediums. My24 selected AT&T to develop My24's Broadcast Platform. In the course of developing My24's Broadcast Platform, AT&T realized the enormous financial rewards and substantial branding and marketing opportunities AT&T would obtain by entering into a joint venture with My24 whereby AT&T would be the exclusive provider of My24's live video news content and would be afforded co-branding and co-marketing rights.

2.      Thus, AT&T and My24 entered into a joint venture whereby AT&T would be My24's exclusive provider and have the co-branding and co-marketing rights. AT&T, in turn, agreed to build My24's Broadcast Platform at AT&T's expense, to fund My24's launch during a Presidential Town Hall Meeting or a debate between President Obama and Governor Romney during the upcoming 2012 U.S. Presidential election, and to sponsor this event. My24 and AT&T entered into a subsequent and related joint venture whereby AT&T would invest $102,000,000 into My24 to finance My24's operations. AT&T, in turn, would receive long term co-marketing and co-branding rights, and billions of dollars in data charges to customers for the consumption of My24's digital content delivered exclusively over AT&T's facilities.

3.      Pursuant to the joint venture pertaining to My24's launch, AT&T developed the Broadcast Platform and worked with My24 in preparing for My24's launch during the Town Hall Meeting and in sponsoring this event. AT&T then fraudulently induced My24 to enter into various Network Agreements by misrepresenting to My24 that it would continue to fund the development of My24's Broadcast Platform, that it would fund My24's launch, and that it would sponsor the Town Hall Meeting. AT&T then breached the joint venture by refusing to fund My24's launch; by refusing to sponsor the Town Hall Meeting; by charging My24 amounts not owed; by holding My24's Broadcast Platform hostage and misappropriating My24's novel idea; and by teaming up, and merging with, DirecTV so that AT&T could provide its customers, through its merger with DirecTV, the same services AT&T had agreed to provide through the joint ventures with My24.

4.      This First Amended Complaint seeks damages for AT&T's wrongful acts, and seeks an Order enjoining AT&T from using My24's novel idea and Broadcast Platform, and requiring AT&T to return the Broadcast Platform and associated intellectual property to My24.

## PARTIES

5.      My24 is a Colorado corporation doing business in the State of Colorado with its

principal place of business located at 1550 Larimer St., #779, Denver, Colorado. My24 is a

digital technology company that produces live digital video news content made assessable, *via*

My24's Broadcast Platform, on mobile, *i.e*., Smartphones and Tablets, and Internet mediums.

My24's live digital video news content is interactive and customizable so that a My24 customer

can customize the My24 live digital video news content according to his or her preference, *e.g.*,

political news, and cause the selected category of live updated digital video news content to be

pushed, or sent, to the customer's Smartphone, Tablet or any other Internet device, at a specified

time.  Mr. Erik Underwood is the CEO and founder of My24. Mr. Underwood is a resident of the

State of Colorado.

6.      Defendant AT&T Corp. is a New York corporation having its principal place of

business at One AT&T Way, Bedminster, NJ 07921. AT&T Corp. is a wholly-owned subsidiary

of AT&T Inc.  AT&T Corp. is authorized to conduct business in Colorado as a

telecommunications provider and does conduct business in Colorado as a telecommunications

provider through its various business units, or through its parent and alter ego AT&T, Inc., which

provides through its various subsidiaries, *inter alia*, mobile telephone service, web design,

content delivery data access, web servers, cloud computing, server colocation, and other

multimedia products and/or services. As more fully alleged herein, AT&T Corp., like all of

AT&T, Inc.'s other subsidiaries, is the agent of AT&T, Inc.

7.      Defendant AT&T, Inc. is a Delaware corporation, with its principal place of

business at 208 South Akard Street, Dallas, TX 75202. AT&T, Inc. does business in Colorado as

a telecommunications provider through its subsidiaries. Specifically, upon information and belief

and as more fully set forth in ¶ 8, *infra*, AT&T, Inc. directs and/or controls AT&T's subsidiaries such that AT&T's subsidiaries constitute agents of AT&T, Inc.

8.      AT&T, Inc. is the parent company of, among other companies, AT&T Corp., AT&T, Mobility, LLC, AT&T Mobility II, LLC, New Cingular Wireless Services, Inc., and AT&T Services, Inc., which report directly to AT&T, Inc. AT&T, Inc. is headed by a thirteen-person Board of Directors, including the CEO and President of AT&T, Inc., Mr. Randall Stephenson. The Board of Directors is responsible for establishing policies and practices in reviewing AT&T's strategic plans on all of AT&T's platforms and business operations. The Presidents of AT&T Corp., AT&T, Mobility, LLC, AT&T Mobility II, LLC, New Cingular Wireless Services, Inc., and AT&T Services, Inc. report to executives at AT&T, Inc., including Mr. Stephenson. AT&T's policies and practices, as alleged herein, are dictated at the corporate level at the direction of the parent company, AT&T, Inc., and are implemented through the subsidiaries, AT&T Corp. AT&T, Mobility, LLC, AT&T Mobility II, LLC, New Cingular Wireless Services, Inc., and AT&T Services, Inc. Upon information and belief, AT&T, Inc. wholly owns each of AT&T, Inc.'s subsidiaries; each of AT&T, Inc.'s subsidiaries is financially dependent on AT&T, Inc.; AT&T, Inc. shares common officers and/or directors of each of its subsidiaries; and/or AT&T, Inc. exercises control over the marketing and operational policies of each of AT&T, Inc.'s subsidiaries. Upon information and belief, AT&T, Inc.'s subsidiaries authorize AT&T, Inc. to perform substantial business within the State of Colorado on their behalf, including marketing, sales, accounting, finance, corporate governance, media relations, and corporate advertising.  AT&T, Inc., as the alter ego of all of its subsidiaries, also performs substantial business in the State of Colorado through its various subsidiaries doing business in the State of Colorado.  AT&T's documents, including publicly filed documents, promote AT&T

as one solidified of business. AT&T Inc. and its subsidiaries file consolidated tax returns and issue consolidated financial statements. In its annual reports to the Securities and Exchange Commission ("SEC") on Form 10K and in its quarterly reports on Form 10-Q, AT&T Inc. refers to itself as "AT&T" or "the Company," defined to mean AT&T Inc. together with its "majority-owned subsidiaries and affiliates." These annual reports show AT&T Inc. considered itself and its subsidiaries to be an integrated, national telecommunication services conglomerate.  As set forth above, in its "AT&T Business Services Agreement," AT&T Corp. states that "AT&T," "the Company," "we," "our" and "us" means the affiliates and subsidiaries of AT&T Inc. that provide or may provide Services to You under this Agreement. In the Tariffs, Guidebooks and Service Guides, AT&T may be referred to as "the Telephone Company," or "the Company".

## AT&T CORP.'S SUBSTANTIAL, CONTINUOUS AND SYSTEMATIC CONTACTS WITH THE STATE OF COLORADO

9.      AT&T Corp.'s contacts with the State of Colorado are so substantial and so continuous and systematic as to render AT&T corporation essentially at home in the State of Colorado. AT&T Corp. received a Certificate of Public Convenience and Necessity ("CPCN") from the Colorado Public Utilities Commission ("CPUC") authorizing AT&T Corp. to provide long distance service and competitive local exchange services to customers throughout the State of Colorado. Pursuant to CPUC Rule 4 CCR 723-2-2103(A)(VI), AT&T Corp. was required to designate the "Name and address of [AT&T's] Colorado agent for service of process in Colorado." AT&T Corp. has designated a Colorado agent for service of process in Colorado.

10.     AT&T Corp. has filed with the CPUC its local exchange services tariff, Colorado PUC No. 9 ("Tariff") setting forth its rates and services. (A copy of AT&T Corp.'s Tariff is attached hereto as Ex. A). AT&T's filed tariff constitutes a contract with each of its subscribers. AT&T's Tariff, advice letter No. 186, effective August 1, 2014, provides, inter alia, that effective

December 15, 2007, the price, terms and conditions for customers with six or more lines are now

governed by the terms of their written contract or AT&T's Business Service Agreement, which

can be found at http://www.att.com/agreement/.

11.      In its "AT&T Business Services Agreement," AT&T Corp. states that "AT&T,"

"the Company," "we," "our" and "us" means the affiliates and subsidiaries of AT&T Inc. that

provide or may provide Services to You under this Agreement. In the Tariffs, Guidebooks and

Service Guides, AT&T may be referred to as "the Telephone Company," or "the Company." (The

AT&T Business Services Agreement is attached hereto as Ex. B). The AT&T Business Services

Agreement also provides that "[u]nless We agree otherwise, any arbitration hearing shall take

place in the county of your billing address." ¶ 8. The AT&T Business Service Agreement further

provides that "the law of the State of the billing address of Your Service shall govern this

Agreement except to the extent that such law is preempted by or inconsistent with applicable

Federal Law." ¶ 11.e.

12.      In its Annual Report filed with the CPUC on April 30, 2015 (Docket 15M-

0051T), AT&T Corp. states that it is a competitive local exchange carrier and a facilities-based

interexchange carrier. (A copy of AT&T Corp.'s Annual Report is attached hereto as Ex. C).

AT&T Corp. identified Century Link as its connecting local exchange carrier.

13.      In connection with the filing of its Annual Report, AT&T Corp. filed with the

CPUC a Motion Seeking Highly Confidential Protection. (A copy of AT&T Corp.'s Motion

Seeking Highly Confidential Protection, and accompanying transmittal letter, is attached hereto

as Ex. D). In the transmittal letter accompanying AT&T Corp.'s Motion, AT&T states:

>        The information in this report details AT&T's Colorado revenues, which
> information, if obtained by AT&T's competitors, would damage AT&T, reveal
> trade secrets and impair the public interest.

14.    In its Motion Seeking Highly Confidential Protection, AT&T Corp. states that:

"[t]he information contained in AT&T's 2014 annual report[] reflects [AT&T Corp.'s] annual gross revenues in the state, identifies those revenues at retail and wholesale levels, and further identifies the sources of these revenue streams by the kind of service provided, i.e., the report identifies revenue obtained from the provision of basic local exchange service, switched access service, and from reciprocal compensation receipts. The report also reflects [AT&T Corp.'s] expenses which include figures for administrative costs, cost of sales, and taxes."

Id., at ¶ 1.

15.    AT&T Corp.'s Motion Seeking Highly Confidential Protection further discusses

AT&T Corp.'s business access lines provisioned in the State of Colorado, AT&T Corp.'s

Colorado wholesale revenues generated from switched access and reciprocal compensation, as

well as the wholesale revenues paid by AT&T Corp. to other carriers in the State of Colorado for

switched access minutes:

Beyond revenue figures, [AT&T Corp.'s] annual report[] include[s] information regarding the total number of business access lines provisioned in 2014 and the number of access lines for which Low Income Telephone Assistance Program ("LITAP") surcharges were remitted, which is not only proprietary but also sensitive competitive information as the number of access lines is an indicator of the number of customers [AT&T Corp.] served during that time period. In addition, [AT&T Corp.'s] report[] disclose[es] the amount of wholesale revenue collected, in terms of switched access and reciprocal compensation, and the amount of wholesale revenue paid by [AT&T Corp.], in terms of switched access minutes purchased from other carriers. The volume of [AT&T Corp.'s] wholesale revenues and expenses is proprietary and competitively sensitive information regarding AT&T's internal wholesale business operations; this information is not appropriate for public disclosure in the open marketplace."

Motion, ¶ 3.

16.    In its Motion Seeking Highly Confidential Protection, AT&T also discusses its

network facilities in the State of Colorado:

The third area covered by [AT&T Corp.'s] annual report[] involves [AT&T Corp.'s] network facilities. Specifically, the report requires [AT&T Corp.] to disclose the location and nature of [its] collocation facilities with Qwest on a wire

center basis. It also requires [AT&T Corp.] to identify the manufacturer and model number of its switches and central office operations, the maximum capacity of those switches, and to identify the "Total Sheath Miles of Fiber" in the state. Taken as a whole, information regarding the identity of [AT&T Corp.'s] network facilities, and the location of those facilities, is inherently proprietary and confidential, warranting protection from public disclosure."

Motion, ¶ 4.

17.    AT&T Corp. entered into an interconnection agreement with CenturyLink that the CPUC approved. In January 2014, AT&T Corp. and Qwest Corporation dba CenturyLink QC entered into an extension of the interconnection agreement, captioned Extension Amendment to Century Link Local Services Platform Agreement. (A copy of the extension amendment is attached hereto as Ex. E).

18.    AT&T Corp. regularly intervenes as of right in CPUC proceedings to protect its substantial telecommunications business conducted in the State of Colorado. For example, in its March 26, 2015 Notice of Intervention as of Right in In the Matter of Distributions from the Colorado High Cost Support Mechanism to Eligible Providers in Accordance with § 40-15-502(5)(a), C.R.S., as Modified by the 2014 Telecommunications Reform Legislation, Docket No. 15M-0158T, pertaining to distributions from the Colorado high-cost support mechanism to eligible providers. (A copy of AT&T Corp.'s Notice of Intervention in Docket No. 15M-0158T is attached hereto as Ex. F). In its Notice of Intervention, AT&T Corp. states that it "operates as a competitive local exchange carrier ("CLEC") in Colorado. In addition to providing business services, AT&T provides local exchange and intrastate telecommunications service. Accordingly, AT&T is obligated to collect and remit certain state surcharges, including the state's High-Cost Support Mechanism ("HCSM") surcharge pursuant to 4 COLO. CODE REGS. 723-2:2846." Id., ¶ 1. AT&T further states that it "files this Notice of Intervention as of Right to protect its legal rights and to comment in and monitor the proceedings and filings in this matter related to

distributions from Colorado's HCSM to eligible providers consistent with legislation enacted in 2014 and COLO. REV. STAT. § 40-15-502 (5) (a)." Id., ¶ 3.

19.    AT&T Corp. also intervened as a matter of right in In the Matter of Commission Consideration of Effective Competition for Basic Service under § 40-15-207, C.R.S. in Certain Areas Served by Qwest Corporation, Doing Business As CenturyLink QC; El Paso County Telephone Company; CenturyTel of Colorado, Inc.; and CenturyTel of Eagle, Inc., Proceeding No. 14M-0947T. (A copy of AT&T Corp.'s Notice of Intervention in Docket No. 14M-0947T is attached hereto as Ex. G). In its Notice of Intervention, AT&T Corp. stated that "[t]he matters raised in this docket as set out in Decision No. C14-1163 directly affect AT&T's business and legally protected rights as a CLEC." Id., at ¶ 2. Docket No. 14M-0947T was opened "to make findings pursuant to Section 207 as to whether basic service in certain areas of Colorado are subject to effective competition or are 'without effective competition' for purposes of section 208 and 502." Decision Opening Proceeding to Determine Areas with and without Effective Competition, Proceeding No. 14M-0947T, ¶ 4, attached hereto as Ex. H).

20.    AT&T Corp. intervened as a matter of right in In the Matter of Commission Consideration of Effective Competition Areas and the Classification of Basic Local Exchange Service Pursuant to 4 CCR 723-2-2213, Proceeding No. 13M-0422T. (A copy of AT&T Corp.'s Notice of Intervention in Docket No. 13M-0422T is attached hereto as Ex. I). In its Notice of Intervention, AT&T Corp. stated that "[t]he matters raised in this docket as set out in Decision No. C13-0522 directly affect AT&T's business and, as a CLEC subject to this Commission's regulatory authority, affect AT&T's legally protected rights." Id., at ¶ 2. In its Notice of Intervention, AT&T Corp. further states that "[p]reviously, AT&T appeared and participated in proceedings directly connected with this docket. For example, AT&T appeared, participated, and

filed comments and/or position statements in the following dockets: this Commission's Telecom Advisory Group (TAG) proceeding, Docket No. 10M-565T and this Commission's telecom reform rulemaking proceeding, docket number 12R-862T." Id., at ¶ 3. Docket No. 13M-0422T was opened "to begin the adjudicatory process that will enable the Commission to make findings pursuant to Section 207 and the Basic Service Competition Rules to determine areas of Colorado that may be classified as ECAs [effective competition areas]." Decision: Opening Docket; (2) Identifying Areas for Initial Review; (3) Providing Direction regarding Data Filings Generally; (4) Requiring Data Updates; (5) Identifying Additional Considerations; and (6) Addressing Procedural Matters, Proceeding No. 13M-0422T, ¶ 7, attached hereto as Ex. J).

21.     AT&T Corp. not only regularly intervenes in proceedings before the CPUC, it also regularly participates in rulemaking proceedings before the CPUC. For example, AT&T Corp. has filed public comments in In the Matter of the Proposed Rules Regulating Telecommunications Providers, Services, and Products, 4 Code of Colorado Regulation 723-3, Docket No. 12R-862T; In the Matter of E-911 Authorities Requesting an Administrative Proceeding Pursuant to Rule 1004 Be Opened to Investigate and Consider Implementation of Next Generation E-911 Service in Colorado, Docket No. 13M-0781T; and In the Matter of the Proposed Rules Regarding Basic Emergency Service, 4 Code of Colorado Regulation 723-2, Docket No. 15R-0318T.

22.     AT&T Corp. has also sued companies in the State of Colorado in connection with its telecommunications facilities in Colorado. For example, in *AT&T Corp. v. Milender White Construction Company*, Case Number 2013CV30465, filed in the Denver District Court, AT&T Corp. brought an action against two contractors in connection with excavation work performed at 71st St. and Argonne Street in Denver, Colorado, alleging, inter alia, that defendants had

damaged the underground utilities owned by AT&T, and seeking damages for not less than $47,359.85. (A copy of AT&T Corp.'s First Amended Complaint in *AT&T Corp. v. Milender White Construction Company* is attached hereto as Ex. K). As another example, on June 30, 2014, AT&T sued a telecommunications company in the United States District Court for the District of Colorado in the case styled *AT&T Corp. v Talley Communications, Inc.*, alleging that defendant failed to pay AT&T for services under various written agreements, including the AT&T Master Agreement, AT&T Managed Internet Services Pricing Schedule, the ACC Business Multi-Service Agreement, and all applicable AT&T Service Guides. AT&T sought damages in amount of not less than $78,157.34. (A copy of AT&T Corp.'s Complaint in *AT&T Corp. v. Talley Communications, Inc.* is attached hereto as Ex. L).

23.     AT&T owns the office building located 2535 E. 40th Avenue, Denver. AT&T also leases space in Denver to house its telecommunications switch which it uses to provide telecommunications services to consumers throughout the State Colorado. AT&T also provides space for its designated agent in Denver.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are from different states and the matter in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) because the Defendants reside in this district.

## GENERAL ALLEGATIONS

**My24's Innovative and Novel Broadcast Platform and E.R.I.C.A Virtual Avatar Search Engine**

26.     In December 2011, My24 designed a novel technical schematic of a backend digital platform ("Broadcast Platform") which would allow My24 to deliver its live video digital news content to Smartphones and Tablets, and other Internet mediums. The Broadcast Platform was novel because it eliminated video buffering in the delivery of the live digital video news content. Moreover, the Broadcast Platform was novel because it enabled My24 to be interactive, thus allowing a customer to customize My24's live digital video news according to his or her preference, *e.g*., political news, and cause the selected category of live updated video digital news content and news alerts to be pushed, or sent, to the customer's Smartphone or Tablet at a specified time. My24 was the first, and on information and belief the only company to date, to design a Broadcast Platform capable of delivering an interactive live video news content to Smartphones, Tablets, and other Internet mediums, while eliminating buffering. The My24 Broadcast Platform also includes a unique pastel color wheel called the "News Wheel" containing icons representing the various types of My24 news content, *e.g*., inside politics. These icons allow a My24 viewer to navigate My24's Broadcast Platform to view a news segment on demand.

27.     Mr. Erik Underwood, My24's CEO, believed the innovative Broadcast Platform and My24's interactive live video news content delivered to Smartphones, Tablets, and other Internet mediums, would revolutionize digital broadcast news. The digital video news content was designed specifically for mobile audiences on the technology platform.

28.     Mr. Underwood and My24 also invented and developed a novel and unique virtual informational avatar to be used either in connection with the Broadcast Platform and

My24's interactive live video news content, or as a stand-alone application. My24's virtual

informational avatar is named "E.R.I.C.A," an acronym for Electronic, Repetitious,

Informational, Clone, Application.  E.R.I.C.A. is a lifelike mobile application that utilizes

artificial intelligence. Originally designed as a virtual news anchor that would broadcast My24

headline news, My24 decided to utilize E.R.I.C.A. as a virtual search engine in association with

Smartphones, Tablets, and Internet mediums.

### My24 Selects AT&T to Build the Broadcast Platform

29.     In or about late May 2011, My24, through its in-house expert, developed the

backend specifications for the Broadcast Platform. My24, however, required a

telecommunications provider to build the Broadcast Platform and to provide a dedicated media

and data server that would distribute My24's digital media and news content globally over

mobile data collection portals and fiber-optic channels. In or about late May and June 2011,

My24 began approaching numerous telecommunications companies, including AT&T, Level 3,

Inc., and Cisco, Inc. regarding the Broadcast Platform build out and the provision of the

dedicated media and data server.

30.     On June 15, 2011, Mr. Underwood had a conference call with Mr. John Tharp, an

AT&T Account Executive, Professional Services, regarding the Broadcast Platform build out and

the provision of the dedicated media and data server. Mr. Tharp expressed his excitement and

enthusiasm regarding the project and believed AT&T could construct the Broadcast Platform

consistent with My24's backend specifications. Mr. Tharp further advised Mr. Underwood that to

construct a functional Broadcast Platform in accordance with My24's backend specifications,

AT&T would need to make certain innovations and inventions as neither AT&T, nor anyone else

for that matter, had ever constructed such a Broadcast Platform.

31.     By e-mail dated June 21, 2011, Mr. Tharp provided Mr. Underwood a document captioned "AT&T Project Definition/My24HourNews.com." After receiving this document, Mr. Underwood telephoned Mr. Tharp advising him that My24 had decided to use AT&T to construct the Broadcast Platform and provide the dedicated media and data server, provided (a) AT&T would agree that the Broadcast Platform and the intellectual property associated with the Broadcast Platform would belong to My24; and (b) AT&T would agree to provide the Broadcast Platform exclusively to My24. Mr. Tharp assured Mr. Underwood that AT&T would agree to those conditions. Mr. Tharp further advised Mr. Underwood that several executives at AT&T were excited to be working on this project because of the novel content delivery technology associated with the Broadcast Platform.

### AT&T and My24 Begin Discussing a Possible Joint Venture Using the Broadcast Platform

32.     In the summer of 2011, AT&T worked on customizing the software components of the Broadcast Platform. During this time, AT&T and My24 began discussing entering into a joint venture in connection with the Broadcast Platform, and how a cross marketing relationship *vis-à-vis* the Broadcast Platform could financially benefit both AT&T and My24. More specifically, Mr. Underwood and Mr. Tharp discussed how AT&T and My24 could cross market in essentially the same manner AT&T and Apple/I-Phone cross marketed their respective services, such that AT&T would preload the My24 Application ("App") on every AT&T cell phone, and My24 would advertise AT&T products on My24 banner ads and during commercial breaks of its programming.

***AT&T Continues Developing the Broadcast Platform, and Agrees that My24 Will Own the Intellectual Property, and that AT&T will Provide the Platform Exclusively to My24***

33.     Meanwhile, AT&T revised project scope definitions and continued working on the evolving scope of the Broadcast Platform project. My24 continued insisting a) on owning all intellectual property developed in connection with the Broadcast Platform, and b) on AT&T exclusivity.

34.     In or about September 2011, Mr. Underwood began having discussions with Mr. Todd Olson, the AT&T executive project manager working on the My24 Broadcast Platform project. Unbeknownst to My24 at the time, Mr. Olson was actually employed by Verio, Inc., a software company to whom AT&T outsourced much of its software design work. Mr. Olson's web address is tolson@at&t-webhosting.com. Mr. Oslon acted on behalf of AT&T, Inc. as its agent.

35.     Mr. Olson and Mr. Underwood discussed, among other things, the terms of a service agreement and accompanying schedules pertaining to the development of the Broadcast Platform, the terms of a nondisclosure agreement ("NDA"), the need for an AT&T account manager to be assigned to My24, and the possibility of a joint venture between My24 and AT&T.

36.     During the last quarter of 2011, Mr. Underwood continued insisting that My24 own all the intellectual property developed in connection with the Broadcast Platform, and that AT&T provide the Broadcast Platform exclusively to My24. Mr. Olson assured My24 that My24 would retain all such intellectual property and that AT&T would exclusively provide the Broadcast Platform to My24.

37.     Between January and April 2012, AT&T continued designing and developing the Broadcast Platform. Commencing March 27, 2012 (and continuing through October 25, 2012),

Ms. Jennifer Currier, a Verio employee who reported to Mr. Olson, regularly e-mailed Mr. Underwood for his approval of wire frames and platform development designs. Ms. Currier's communications with Mr. Underwood amounted to hundreds of emails pertaining to every aspect of the Broadcast Platform design.

38.     AT&T requested that My24 provide it with even more detailed backend specifications for the Broadcast Platform. By e-mail dated April 6, 2012, in response to AT&T's request, Mr. Underwood provided Mr. Olson his [Mr. Underwood's] "notes on the technical design aspects for the different phases of this platform development." Mr. Underwood stressed that this information remain confidential. Mr. Underwood also advised Mr. Olson that My24 had elevated its profile by acquiring former CNN/Time Warner executives and anchors, including Bob Furnad, as My24's President; John Heintschel, as My24's CFO; and Cindy Argendeli, as My24's Human Resources executive.

39.     By e-mail dated April 6, 2012, Mr. Olson advised Mr. Underwood that "this document [Mr. Underwood's above-referenced notes, ¶27, *supra*] is excellent detail for the network and infrastructure team." Mr. Olson further advised Mr. Underwood that he would "work with those teams to continue the specification definition of the environment to support the platform." In response to Mr. Underwood's continued request that My24's documents and information remain confidential, Mr. Olson advised Mr. Underwood that "[a]s always, we will continue to take your needs with confidentiality very serious." Mr. Underwood later provided Mr. Olson with more updated specifications on May 24, 2012.

### AT&T Assigns Ms. Pepe as the Account Manager for My24, and Discussions Regarding a Joint Venture Between AT&T and My24 Escalate

40.     During March and April 2012, Mr. Olson and Mr. Underwood continued discussing the possibility of a joint venture between AT&T and My24 in connection with the Broadcast Platform. Among other things, Mr. Olson and Mr. Underwood discussed the cross marketing opportunities of a joint venture; the various business units of AT&T that would be involved in a joint venture; and the possibility of AT&T providing My24 with a channel on AT&T's U-Verse, a TV service using Internet Protocol Technology.

41.     During a conference call held on April 20, 2012, Mr. Olson advised Mr. Underwood that AT&T had assigned Ms. Barbara Pepeas the account manager for My24. Ms. Pepe is an Executive Account Manager for AT&T Services, Inc. AT&T Services, Inc. is a wholly owned subsidiary of AT&T, Inc. Mr. Olson explained to Mr. Underwood that Ms. Pepe (who also participated on the call) would serve as the liaison between AT&T and My24. Mr. Olson further explained to Mr. Underwood that Ms. Pepe would be responsible for coordinating the various AT&T business units, *e.g*., AT&T mobility and AT&T U-Verse, which would be interacting with My24. Mr. Olson also explained that Ms. Pepe would be responsible for coordinating joint venture discussions between AT&T and My24 in connection with the Broadcast Platform.

### The Development Specification for Phase 1 of the Broadcast Platform Project

42.     Meanwhile, AT&T continued developing the Broadcast Platform. By e-mail dated May 1, 2012, Ms. Currier provided Mr. Underwood with the Development Specification for Phase 1 of the Broadcast Platform project for his approval. This document provided a comprehensive overview of all the technical design requirements identified throughout the initial design phase for My24, including, *inter alia*, development requirements for the recent My24

logo and icons, landing page, supporting website graphics, *e.g*., the News Wheel, content

management, administration, mobile enabled design and mobile application.

43.     The Development Specification for Phase 1 Broadcast Platform provided the

following Development Project Overview:

> My24HourNews.com is a 24 Hour News Network which will deliver headline
> news stories to viewers throughout the world through live streaming videos based
> specifically on user interests and preferences through a web browser and mobile
> apps.
>
> Visitors to the website will have access to an On Demand Video Directory
> featuring Videos from various News Segment Categories. Website users can sign
> up for News Notification Alerts featuring the news topics that matter the most to
> them.
>
> Notification of News Headlines will be delivered via SMS and Mobile Apps
> allowing subscribers to receive a message with an overview of top news story
> segments, every hour on the hour.
>
> While there will be multiple phases required to meet the development and
> marketing goals for My24HourNews.com, the AT&T Professional Services
> Development Team understands that the following components and tests are
> necessary to complete Phase 1 of development.

44.     In a nutshell, Phase 1 consisted of the development and build out of the Broadcast

Platform and App.

### *Ms. Pepe Requests My24 to Provide AT&T with Detailed Information, Including an Executive Summary and Market Strategic* **Analysis, for a Two Day "Strategic Partnership" Meeting**

45.     After the April 20, 2012 conference call, Ms. Pepe had daily telephone calls with

Mr. Underwood regarding the Broadcast Platform and the potential joint venture between AT&T

and My24. In discussing the potential joint venture, Mr. Underwood advised Ms. Pepe of the

significant investment My24 sought from AT&T to cover My24's expenses in launching the

Broadcast Platform and in conducting business operations. Ms. Pepe, in turn, advised Mr.

Underwood of AT&T's interest in the significant branding opportunity such a joint venture would afford AT&T, as well as AT&T's interest in obtaining a percentage ownership interest in My24.

46.     Ms. Pepe and Mr. Underwood agreed to a two-day partnership/investment meeting between AT&T and My24 in Atlanta, Georgia for May 31 and June 1, 2012. By e-mail dated May 8, 2012, Ms. Pepe requested Mr. Underwood to "provide the details for the meetings for 5/31 and 6/1 so that the AT&T Account Team can move forward with travel arrangements." Ms. Pepe further advised Mr. Underwood that she would "be inviting [AT&T's] supervisors and someone from AT&T Marketing."

47.     By e-mail dated May 8, 2012, Mr. Underwood provided Ms. Pepe and Mr. Olson "a preliminary agenda in the form of a PDF for our meeting later this month." Mr. Underwood had prepared the agenda based on his communications with Ms. Pepe and her suggestions regarding appropriate topics. The agenda provided, among other things:

- "What is My24HourNews.Com? - Power Point."
- "Technical Components Discussion/Winston will explain broadcasting components and requirements related to My24/AT&T platform buildout, steps, phases, and execution of what is needed. -PowerPoint Presentation."
- "Question/Answer Period-Technical questions fielded by Winston and Erik
- "My24's Six Revenue Streams - Overview of My24/AT&T upside. Worst-case scenario and best case outlook."
- "My24HourNews.Com overview platform build out and project objectives/Todd & Jennifer - Jennifer will explain how My24HourNews.Com can be number 1 in the world."
- "What does a My24HourNews.Com Partnership looks [sic] like with AT&T? - PowerPoint model 'All Rising Tides Lifts All Boats.' Exclusivity = Investment Deal & Resources."
- "My24 broadcast on AT&T Uverse....What will the user/viewer experience look like with future brands?"

- "AT&T Mobility....a My24 preloaded on every AT&T cell phone/Jennifer, Dana, & Todd will discuss the unique My24 News App with ERICA."
- "Product Sponsorship and placement - AT&T/Apple for My24."
- "Discussion on bring [sic] all of the AT&T divisions together in order to achieve Partner/Investment goals that will bring in a successful launch."

48.     In his May 8, 2012 e-mail, Mr. Underwood also provided Ms. Pepe a "Strategic Global Partnership of Information/News Dominance." This document provided that the purpose of the meeting was to explain My24's structure and where it is headed, and "to align a strategic partnership between AT&T and My24; to have global dominance of Non-Commentary News, Music, Movies, and other Brands associated with My24." This document further observed that My24 anchors would state at the top and bottom of the hour "This Broadcasting Platform is being powered by AT&T." This document also proposed that the distribution of content and programming be made on Smartphones and Tablets, as well as on an AT&T U-Verse channel.

49.     By e-mail dated May 8, 2012, Ms. Pepe thanked Mr. Underwood for the information and asked Mr. Underwood "who are you working with in Uverse?"

50.     By e-mail dated May 10, 2012, Ms. Pepe requested additional information from My24 so that she could "engage the additional areas to be certain to we [sic] cover all your business needs."

51.     By e-mail dated May 11, 2012, My24 and AT&T signed a Mutual Non-Disclosure Agreement ("NDA"). Under the NDA, AT&T and My24 agreed that "Confidential Information" included, *inter alia*, pricing and financial data, network designs and design proposals, analyses, proposals, business plans, forecasts, plans and specifications of any product or service, drawings, models, software, and prototypes.

52.     By e-mail dated May 14, 2012, Mr. Underwood responded to Ms. Pepe's May 10 e-mail and provided her a My24 Executive Summary and Market Strategic Analysis. The Executive Summary set forth in detail, *inter alia*, My24's marketing and revenue summaries, expenses, and capital needs for the launch of My24. The Market Strategic Analysis analyzed the market for Smartphones and Tablets and showed that My24 could potentially become a multi-billion dollar company based on advertising revenues.

53.     By e-mail dated May 18, 2012, Ms. Pepe provided Mr. Underwood with a tentative list of AT&T attendees for the AT&T/My24 Partnership Meeting:

- Barbara Pepe - Wholesale Sales Executive
- Michael McCreary - Wholesale Applications Sales Executive
- Blair Bardwell - Wholesale Sales Director
- Scott Hogg - Lead Channel Manager, Business Marketing
- Lee Culver - AVP Video Development U-Verse
- Matt Henschel - Wholesale Mobility Sales Executive
- Terry Sellers - Enterprise Mobility Integration Manager
- Larry Kahn - Wholesale Network Integration Manager
- Aaron Gage - Wholesale Hosting Sales Executive

54.     Ms. Pepe advised Mr. Underwood that she had distributed to the foregoing persons the documents he had provided her pertaining to the upcoming AT&T/My24 Partnership Meeting and that these persons had expressed much interest and excitement regarding the proposed joint venture.

### *AT&T and My24 Participate in the AT&T/My24 Partnership Meeting -- Day 1*

55.     On May 31, 2012, AT&T and My24 participated in the first day of the scheduled AT&T/My24 Partnership Meeting held at the law office of Morris, Manning and Martin in Atlanta, Georgia. At this time, the development of the Broadcast Platform was almost complete.

My24, however, had not executed any agreements with AT&T in connection with the Broadcast Platform build out, with the exception of the NDA.

56.     The individuals identified in ¶53, *supra*, attended the AT&T/My24 Partnership 53Meeting on behalf of AT&T. In addition, Mr. Olson participated on behalf of AT&T, and Ms. Currier and Ms. Dana Yates participated by conference call on behalf of AT&T.

57.     The following persons attended the AT&T/My24 Partnership Meeting on behalf of My24:

- Erik Underwood – CEO
- Colonel (Retired) Anthony C. Aiken - Board Member
- Pamela Harris - COO/Board Member
- Judge (Retired) Thelma Wyatt Moore - General Counsel
- Cindy Argendeli - Executive Director Human Resources
- Winston Johnson – My24 Chief Technical Officer
- Alson Jones – Animator and Cartoonist contracted by My24 in connection with My24's eventual progression to provide multimedia digital content
- Vance Hornbuckle, My24 President-Music
- Mac Hunter - outside counsel

58.     Additional attendees at the AT&T/My24 Partnership Meeting were Michelle Williams, an account manager from the Associated Press, and Robert Posner, the President of Posner Advertising in New York, who My24 intended to engage as its advertising representative.

59.     The AT&T/My24 Partnership Meeting followed the Agenda, ¶460, *supra*. Mr. Underwood provided all of the AT&T participants with the My24 Executive Summary and the Market Strategic Analysis. Mr. Underwood explained the proposed joint venture whereby AT&T Mobility would preload the My24 App on every AT&T Smartphone and exclusively deliver My24's live digital video news content to Smartphones, Tablets, other Internet devices, and over

an AT&T U-Verse channel. Mr. Underwood explained that AT&T would provide product sponsorship and placement, would cross market AT&T, and would co-brand its name with My24.

60.     During this first day of the AT&T/My24 Partnership Meeting, AT&T explained how it could bring all of the divisions of its various subsidiaries together to achieve the proposed partnership/investment goals and successfully launch My24. Mr. Underwood then explained how the proposed joint venture would substantially increase the revenues generated by the various associated AT&T business units.

61.     Mr. Underwood next advised the participants that under the proposed AT&T/My24 Joint Venture, AT&T would invest $25 million for My24's launch, $2.2 million for Headquarter expenses, $75 million for brand development for My24's other digital media brands including E.R.I.C.A., for a total investment of $102.2 million. AT&T would also provide My24 a channel on U-Verse. AT&T would be the exclusive provider of My24, would receive 20% of My24, and would co-brand AT&T with My24.

62.     Also, during this first day, Mr. Bardwell stated that AT&T installing a My24 App on AT&T cellphones would greatly benefit AT&T and that AT&T was excited about the cross marketing possibilities. Mr. Culver agreed that if the parties entered into a joint venture, AT&T would provide My24 with a channel on U-Verse and that AT&T would develop and perform beta testing on a new AT&T U-Verse platform. Mr. Culver also stated that the new AT&T U-Verse platform would allow a My24 App to slide from a Smartphone or Tablet onto a TV which would allow a customer to view, and interact with, My24 on the customer's TV.

63.     At the end of the first day of the AT&T/My24 Partnership Meeting, Mr. Underwood provided a presentation on E.R.I.C.A. and explained the features of its mobile search

engine and software. The AT&T participants expressed excitement regarding E.R.I.C.A.'s novel capabilities. Mr. Underwood, however, stated that My24 did not desire to develop E.R.I.C.A. during the first phase of the proposed joint venture, but instead desired to develop E.R.I.C.A in a later phase.

### *AT&T/My24 Partnership Meeting-Day 2 -- AT&T and My24 Agree to a Joint Venture*

64.     On June 1, 2012, AT&T and My24 participated in the second day of the AT&T/My24 Partnership Meeting. Immediately prior to the commencement of the meeting, Mr. Bardwell and Ms. Pepe asked Mr. Underwood to leave the conference room so they could speak to him in private.

65.     During this private meeting, Mr. Bardwell advised Mr. Underwood that AT&T would agree to a joint venture with My24 ("JV-My24 Launch") whereby AT&T would agree to fund My24's launch if My24 would agree to launch My24 at a Presidential Town Hall Meeting, or a debate, between President Obama and Republican candidate Governor Mitt Romney during the then upcoming 2012 U.S. Presidential election. Mr. Bardwell further advised Mr. Underwood that AT&T would agree to sponsor My24's launch during the Town Hall Meeting or debate and would cross market and co-brand AT&T with My24 during this launch. Mr. Bardwell further stated that AT&T would exclusively provide the Broadcast Platform to My24 -- AT&T could not provide the Broadcast Platform to any other person, and My24 could not use another common carrier to deliver My24 live digital video news content. Mr. Bardwell advised Mr. Underwood that if My24 agreed to launch during the Town Hall meeting or debate, AT&T would agree to a subsequent joint venture with My24 whereby AT&T would provide My24 $102.2 million for My24's multimedia expansion, and whereby My24 would give AT&T a 20% interest in My24, along with the cross marketing and co-branding rights (JV-My24 Multimedia Expansion).

66.     Mr. Bardwell next advised Mr. Underwood during this private meeting that if My24 would not agree to launch My24 at the Town Hall Meeting, AT&T would agree to the JV-My24 Launch, but only if My24 agreed to immediately begin developing E.R.I.C.A.

67.     Mr. Underwood advised Mr. Bardwell that My24 would agree to Mr. Bardwell's first condition and launch My24 during the Town Hall Meeting or debate.

68.     After this private meeting, Mr. Underwood, Mr. Bardwell and Ms. Pepe reentered the conference room. Mr. Underwood announced to all of the participants that AT&T agreed to a joint venture with My24 (JV-My24 Launch) whereby AT&T would agree to fund My24's launch, and My24 would agree to launch My24 in a Presidential Town Hall Meeting or a debate between President Obama and Governor Romney during the upcoming 2012 U.S. Presidential election. Mr. Underwood further announced that AT&T agreed to sponsor My24's launch during the Town Hall meeting or debate and would cross market and co-brand AT&T with My24 during this launch. Mr. Underwood also announced to participants that AT&T agreed to a second joint venture with My24 (JV-My24 Multimedia Expansion) whereby AT&T would provide My24 $102.2 million for My24's multimedia expansion, and whereby My24 would give AT&T a 20% interest in My24, along with the cross marketing and co-branding rights.

69.     Mr. Bardwell then requested that Mr. Underwood provide him a My24 business plan in the Harvard Business School format which Mr. Bardwell could provide to the various AT&T, Inc. subsidiaries to ensure that My24 received all of the required AT&T resources for the My24 Town Hall Meeting launch. Mr. Bardwell advised the participants that AT&T would agree to support and fund My24's launch and sponsor My24 in a Presidential Town Hall Meeting or a debate. Mr. Bardwell again assured My24 that AT&T would provide everything My24 needed in order to launch.

70.     Mr. Bardwell next asked Mr. Underwood whether he could contact the political parties to arrange the Presidential Town Hall meeting or a debate. Mr. Underwood agreed to do so, but requested that AT&T provide My24 with a document showing AT&T's agreement to sponsor the event. Mr. Underwood explained that he would need to show this document to the political parties and to persons associated with the forum in which the Town Hall Meeting would be held so that these persons would know of AT&T's involvement and seriously consider My24's request. Mr. Bardwell agreed that AT&T would provide My24 with this document.

*AT&T and My24 Commence the Joint Venture and Begin Preparing for the Town Hall Launch*

71.     By e-mail dated June 4, 2012, Mr. Underwood emphasized to Ms. Pepe that "[a]s we have set clear goals for the launch of My24, there is a lot of work to be done." Mr. Underwood advised Ms. Pepe that "[a]s discussed, [Mr. Olson] will set up weekly meetings to focus on the launch of My24, and I am pleased and excited that our two-day meeting will bring about the success that it so deserves." Mr. Underwood further stated "[o]nce again, I thank everyone, and I am very excited that you are part of this great venture."

72.     By e-mail dated June 4, 2012, Ms. Pepe thanked Mr. Underwood for hosting the meeting "to unveil My24 to the AT&T Team." Ms. Pepe advised Mr. Underwood that she would "be scheduling meetings today that will help keep our teams informed and on track." Ms. Pepe further advised Mr. Underwood that "[a]s we discussed prior to the meeting, I am very excited to be engaged in this venture and will do what I can to help make it a success that we all foresee."

73.     By e-mail dated June 4, 2012, Mr. Bardwell advised Mr. Underwood that he had spoken with Mr. Posner of Posner Advertising, and that he would be sending Mr. Underwood and Mr. Posner "an outline later today that should help us all build a consistent story about My24."

Mr. Bardwell explained that he "wanted to make sure that we are all singing from the same Hymnal, so to speak, but I wasn't sure if he had something in mind as well."

74.     By e-mail dated June 4, 2012, Mr. Bardwell sent Mr. Posner and Mr. Underwood the Harvard Business School format for business plans, noting that he "would like to offer you a format that I find very helpful in presenting a business plan." Mr. Bardwell further stated that he "need[s] to build a story in a format that my peers are familiar with." Mr. Bardwell explained that "AT&T is really interested in NPS [Net Promoter Score], and therefore we need to think about how My24HourNews.Com will help us elevate those scores." Mr. Bardwell was referring to AT&T, Inc. together with all of its subsidiaries when referring to AT&T not promoter score.

75.     Thus, AT&T's desire and agreement to participate in the Joint Venture with My24 was aimed, in part, at AT&T's interest in elevating AT&T's NPS, which is a management tool that can be used to gauge the loyalty of a firm's customer relationships. The primary purpose of the NPS methodology is to evaluate customer loyalty to a brand or company, not to evaluate their satisfaction with a particular product or transaction. The ability to measure customer loyalty is a more effective methodology to determine the likelihood that the customer will buy again, talk up the company and resist market pressure to defect to a competitor.

76.     By e-mail dated June 5, 2012, Ms. Pepe requested information from Mr. Underwood pertaining to the Content Delivery Network.

77.     By e-mail dated June 6, 2012, Ms. Pepe advised Mr. Underwood that the information he had sent her regarding back end specifications for the Content Delivery Network "was great." Ms. Pepe also asked Mr. Underwood whether he had looked at the Harvard Business School format for business plans sent by Mr. Bardwell. Ms. Pepe advised Mr. Underwood "that

this will help us to work with the various departments within AT&T and be sure they all have the same information." Ms. Pepe advised Mr. Underwood that she would be calling him later regarding the "Project Management aspect."

78.    By e-mail dated June 7, 2012, Mr. Olson advised Mr. Posner, who was present during the AT&T/My24 Partnership Meeting, that "I just talked with the team and we are at the point where it would be good for our two teams to have a discussion."

79.    Consistent with AT&T's agreement to enter into the Joint Venture with My24 and launch My24 during the Presidential Town Hall Meeting, by e-mail dated June 7, 2012, Mr. Posner, who was present during the AT&T/My24 Partnership Meeting, advised Mr. Underwood that he had been "meeting with Creative Directors, Media Planners and Sales Professionals to select the right talent in preparation of launching our efforts in full swing early next week." Mr. Posner further advised Mr. Underwood he would like to dedicate time to Mr. Olson the following week, but that "until were fully engaged and receive a substantial check, I am reluctant to commit more time and resources to getting things ramped up without having a retainer in placed to charge time against."

80.    On June 12, 2012, Mr. Underwood, Ms. Pepe and Mr. Posner had a phone conference regarding Mr. Posner's advertising services and required retainer. Later that day, by e-mail dated June 12, 2012, Mr. Posner provided Mr. Underwood with an estimate for the brand strategy, creative development and initial media planning services, along an Agreement of Terms. During a telephone conversation later that day, Mr. Posner explained to Mr. Underwood that he required a retainer. Mr. Underwood again explained that he was awaiting the funding promised by AT&T during the AT&T/My24 Partnership Meeting.

81.     By e-mail dated June 12, 2012, Mr. Posner provided Mr. Underwood with a marketing opportunity document regarding reward points in which Mr. Posner stated "[w]e believe that My24HourNews.Com and AT&T have mutually beneficial partnership opportunity. One that can only be enhanced through leveraging the relationship as it pertains to marketing." Mr. Posner observed that under this opportunity "AT&T creates greater customer loyalty." Mr. Posner further observed that this message regarding reward points "can be placed in both My24HourNews.Com and AT&T self-promotion environments to maximize customer participation."

82.     On June 14, 2012, Ms. Pepe, Mr. Bardwell and Mr. Underwood had a telephone conference regarding the My24 business plan Mr. Bardwell had requested. During this conference call, Mr. Bardwell again assured Mr. Underwood that, in accordance with the agreed-upon joint venture, My24 would receive the funds from AT&T required to launch during the upcoming Town Hall Meeting debate, and that AT&T would sponsor the Presidential Town Hall Meeting.

83.     By e-mail dated June 19, 2012, Mr. Underwood sent Mr. Bardwell the My24 Business Plan in the format requested by Mr. Bardwell, which, among other things, set forth AT&T's total investment in My24 and the number of My24 shares AT&T would receive. Mr. Underwood also provided Mr. Bardwell with My24's Summary Pro Forma Profit and Loss and My24's Headcount and Personnel Expense.

84.     On June 21, 2012, Ms. Pepe arranged for a conference call to be held on June 22, 2012, among herself; Mr. Bardwell; Mr. Underwood; Ms. Harris; Ms. Lynne Jansons of MEC Global; Shahab Azmoudeh, an AT&T network engineer; and Michael McCrary, Ms. Pepe's

assistant. Ms. Pepe sent a meeting request e-mail to these individuals. The subject matter of this e-mail was identified as "Sponsorship Discussion for My24."

85.     On information and belief, MEC Global is the fifth largest media agency network in the world. On information and belief, MEC Global provides advertising, brand marketing, brand partnership, and sponsorship activation services to its client, AT&T. During this time, Ms. Jansons was a Digital Director, AT&T Mobility, for MEC Global. Ms. Jansons' duties included, among other things, handling first-to-market opportunities, emerging technologies and sponsorship activation's. Ms. Jansons advised Mr. Underwood that she was providing marketing and sponsorship activation services for AT&T in connection with the Town Hall Presidential Meeting.

86.     During the June 22, 2012 telephone conference call, the parties discussed My24's financial needs and required resources to successfully launch My24 during the Presidential Town Hall Meeting. More specifically, the parties discussed, among other things, expenses for advertising, security, marketing, forum, stage backdrop, finalization of the Broadcast Platform and associated facilities, and hotels. The parties also discussed possible venues, the AT&T divisions involved, and simulcasting My24 on an AT&T U-Verse channel. Mr. Bardwell pressed Mr. Underwood on obtaining a venue. The parties next discussed the need for a sponsorship letter and the contents of the letter. Mr. Bardwell again assured Mr. Underwood that AT&T would fund the Broadcast Platform and the My24 launch, and fund and sponsor the Presidential Town Hall Meeting. Mr. Bardwell further advised Mr. Underwood that although the funding was assured, it had to be processed through required AT&T channels.

***Using the Sponsorship Letter Prepared by AT&T, Mr. Underwood Begins Contacting
the Respective Political Parties***

87.     By e-mail dated June 22, 2012, Ms. Pepe provided Mr. Underwood with a draft

sponsorship letter for Mr. Underwood's approval, stating that she would like his thoughts prior to

getting approval from AT&T legal. The draft letter provided:

> AT&T has been selected by My24HourNews.Com to build an online platform.
> My24HourNews.Com believes this platform will forever change the way users
> and viewers will receive their news and information.
>
> My24HourNews.Com plans to launch their service this fall as a Global Non-
> Commentary News Network that will 'Broadcast in High Definition on all Cell
> Phones and Internet Devices. AT&T is dedicated to help My24HourNews.Com
> meet this objective.
>
> My24HourNews.Com has communicated to AT&T that they would like to
> Broadcast the first 24/7 Political and Election Coverage Network. This will
> include a Town Hall meeting in October after the Republican Convention in
> August for Governor Mitt Romney and the Democratic Convention for President
> Obama in September. AT&T is providing transport, infrastructure, hosting and
> cloud technologies to deliver My24HourNews.Com to millions of potential
> viewers.
>
> Using AT&T as its exclusive provider for technology services,
> My24HourNews.Com is determined to make history; this will be the first time
> that a Town Hall Meeting will be broadcast globally on carrier agnostic
> Smartphones, Tablets, and any capable Internet device. This platform is scalable
> to over 80 Million Viewers world-wide, and AT&T is dedicated to make this a
> premier viewing experience for all Internet users.

88.     Later that day, on June 22, 2012, Ms. Pepe telephoned Mr. Underwood and

advised him that he could send the sponsorship letter to both political camps and to the forum

hosting the Town Hall meeting.

89.     With the sponsorship letter in hand, Mr. Underwood communicated with the

Obama and Romney campaigns to secure the Presidential Town Hall in accordance with the Joint

Venture between AT&T and My24, *viz*., the JV-My24 Launch. Mr. Underwood, among other

things, sent an e-mail on June 14, 2012 to Mr. David Axelrod, President Obama's campaign

advisor, advising him of My24's service and stating that My24 was proposing two separate Presidential Town Hall meetings. Mr. Underwood further advised Mr. Axelrod that "[t]he Town Halls will include President Obama and Governor Romney, with AT&T sponsoring the event as a public service event for national and international viewers of My24HourNews.Com." Mr. Underwood further stated "[w]e will take care of all production costs and arrangements." Mr. Underwood also stated "[w]e will also choose an important Swing State (Ohio, Florida or Pennsylvania) focusing on jobs, the economy, and small business." Mr. Underwood added "AT&T will help with the marketing effort and will plan to accommodate Internet traffic for 70 to 80 million viewers."

90.     Mr. Underwood also telephoned David Plouffe, President Obama's Senior Whitehouse Political Advisor; and Kevin Lewis, President Obama's Communications Director. Additionally, Mr. Underwood communicated with Mr. Romney's campaign regarding the Town Hall Meeting, and advised it that Ms. Pepe and Mr. Hogg were working with My24 on a daily basis and coordinating My24's efforts on the back end.

91.     Mr. Underwood kept Ms. Pepe advised regarding all of his communications with the Obama and Romney campaigns and his use of the Sponsorship Letter.

***Ms. Pepe Ramps Up Her Duties in Connection with the My24 Town Hall Meeting launch***

92.     By e-mail dated June 26, 2012, Ms. Pepe advised Mr. Underwood that, with respect to the Presidential Town Hall, she needed to know "1. Where the Town Hall will be broadcast? 2. What is the viewership you expect on My24? 3. How and when will the news access lottery be held?" Ms. Pepe also provided Mr. Underwood information on past Town Hall/debate viewership.

*Ms. Jansons of MEC Global Ramps Up Her Duties in Connection with the My24 Town Hall Meeting Launch*

93.     By e-mail dated June 28, 2012, Ms. Jansons of MEC Global asked Mr.

Underwood whether he had "some time to regroup." The subject matter of this e-mail was

"AT&T Sponsorship Opportunity-24hournews." Mr. Underwood spoke with Ms. Jansons the

next day and discussed the possible venues for the Town Hall Meeting.

94.     During June and July 2012, Mr. Posner discussed with Mr. Underwood marketing

for the Town Hall Meeting and continued inquiring of Mr. Underwood as to the status of AT&T

funding My24.

*Ms. Pepe Coordinates Technical Discussions regarding AT&T and My24 and Finalizing the Development of the Broadcast Platform*

95.     Meanwhile, AT&T finalized the development of the My24 Broadcast Platform,

and Ms. Pepe coordinated the technical discussions between AT&T and My24. AT&T and My24

had not signed any agreements pertaining to the development of the Broadcast Platform; instead,

the parties had been acting in furtherance of the JV-My24 Launch agreed upon at the

AT&T/My24 Partnership meeting.

*AT&T Flip-Flops on the Sponsorship Letter, Even Though Ms. Pepe Had Authorized Its Release on June 22, 2012*

96.     Although Ms. Pepe had verbally approved the Sponsorship Letter on June 22,

2012, Mr. Underwood had discussions with AT&T regarding the sponsorship letter on July 27,

2012. By e-mail dated July 27, 2012, Ms. Pepe thanked Mr. Underwood for "discussing the

Letter for the political camps." Ms. Pepe further stated "[a]s we discussed, the attached is the

verbiage that My24 can use to provide a letter to the political camps on My24 Letterhead. We

discussed that you can also CC both me and Scott Hogg as AT&T representatives on this

project." The Sponsorship Letter attached to Ms. Pepe's e-mail is essentially identical to the letter

Ms. Pepe verbally approved on June 22, 2012.

97.     Ms. Pepe copied her July 27 e-mail to, *inter alia*, Mr. Bardwell, Mr. Hogg and

Ms. Wendi Fuller of Fleishman Hillard, an international marketing and advertising company that,

on information and belief, provides, among other things, brand marketing, sponsorships, and

strategic partnership services to AT&T. In discussing brand marketing, Fleischman Hillard's

website provides:

> In today's marketplace, ideas matter more than ever - ideas that audiences see as
> their own, which can be authentically expressed through a brand. The goal of
> brand marketing has been to recognize these opportunities and create a
> collaborative endeavor with the customer. They're no longer the audience, but the
> participant - and the brand is the enabler of a shareable experience.
>
> Only when a brand taps into these opportunities do we see the kind of engagement
> that can create positive momentum in the marketplace and truly be transformative
> to a brand's position, market share and public perception. These magnetic ideas,
> inspired by cultural, channel and audience insights, and aligned with the right
> influencers and strategic partners, are the specialty of Fleishman Hillard's brand
> marketing practice. We specialized in 3 key areas of client need: 1) launching
> products and services 2) repositioning themselves to create opportunity 3)
> growing/expanding their positions of leadership.

98.     Fleischman Hillard's website describes its sponsorships and strategic partnerships

and experimental marketing services as follows:

> Across consumer lifestyle, entertainment, sports, social platforms for media
> organizations, we help organizations secure strategic sponsorships and alliances,
> using pre-establish criteria and objectives to find a brand's best correlation. This
> process evaluates brand assets alongside the assets of the partnering entity to
> create a customized relationship it advances a brand's goals.

99.     These services provided by Fleishman Hillard, *viz.*, brand marketing,

sponsorships and strategic partnerships, are the very components of the Joint Ventures between

AT&T and My24 agreed upon at the AT&T/My24 Partnership Meeting.

100.     Later that day, by e-mail dated July 27, 2012, Ms. Pepe advised Mr. Underwood that she had been notified there would be additional discussions the following week regarding the sponsorship letter and to hold up on using the letter until she got back to him. Ms. Pepe advised him she would provide a draft as soon as it was available. Ms. Pepe did not mention in her e-mail the fact that she had previously consented to Mr. Underwood's use of the sponsorship letter back on June 22, 2012, and that she had known that Mr. Underwood had already sent the letter to the respective political camps.

101.     By e-mail dated August 1, 2012, Mr. Hogg advised Mr. Underwood that "[w]hile we greatly appreciate My24HourNews.Com's invitation for AT&T to be included in the letter that My24HourNews.Com plans to send to the Obama and Romney campaigns about the town hall/debate, unfortunately, we must decline at this time, based on our existing plans related to the election." Mr. Hogg further advised Mr. Underwood that "[a]s a company, AT&T has been deeply engaged with work underway for several months with both political parties to support the upcoming national conventions and other related initiatives. We appreciate your understanding and value the business relationship that we are establishing with My24HourNews.Com."

102.     Notwithstanding Mr. Hogg's August 1 e-mail, Ms. Pepe assured Mr. Underwood that AT&T would provide the funding for the Town Hall Meeting and urged Mr. Underwood to continue making arrangements for the Town Hall Meeting.

103.     Also, by e-mail dated August 2, 2012, consistent with the repeated assurances provided by Mr. Tharp and Mr. Olson, Ms. Pepe reassured Mr. Underwood that the intellectual property developed in connection with the Broadcast Platform would belong to My24.

### *AT&T Completes the Development of the Broadcast Platform, and AT&T and My24 Communicate with Ohio State University regarding the Hosting of the Town Hall Meeting*

104.    By the beginning of August 2012, AT&T had completed the development of The Broadcast Platform. Moreover, AT&T and My24 had been acting in furtherance of the JV-My24 Launch agreed upon on June 1, 2012. AT&T had agreed to fund and sponsor the Town Hall Meeting and pay for the launch of My24. AT&T urged Mr. Underwood to continue his efforts in connection with the Town Hall Meeting and the launch of My24.

105.    By e-mail dated August 9, 2012, Ms. Pepe scheduled a conference call for the following day requesting the recipients of the e-mail to "[p]lease attend this conference call to discuss the Presidential Town Hall with Ohio State University and My24HourNews.com." Ms. Pepe's e-mail was sent to, *inter alia*, Mr. Underwood, Mr. Hogg and Mr. Joe Camoriano, Director National Broadcast Media, Ohio State University.

106.    One of the purposes of the conference call on August 10 was to advise Mr. Camoriano that AT&T would be sponsoring the Town Hall Meeting, as Mr. Camoriano needed to be assured of this fact before Ohio State University would proceed with the Town Hall Meeting. During the conference call, Ms. Pepe represented to Mr. Camoriano that AT&T would be sponsoring the Town Hall Meeting. During the conference call, the participants discussed, among other things, various expenses that would be associated with the Town Hall Meeting, including security, rent, venue, stage production and event tickets. With respect to event tickets, Mr. Hogg explained that the tickets would be holographic tickets containing the words AT&T/My24. Ms. Pepe assured Mr. Camoriano that AT&T would pay all of these expenses.

107.    On August 16, 2012, Mr. Underwood traveled to Columbus, Ohio and met with Mr. Camoriano. Mr. Camoriano provided Mr. Underwood with a tour of the Archie M. Griffin

Grand Ballroom and the Performance Hall, and gave Mr. Underwood potential dates during the month of October for the Town Hall Meeting.

### *AT&T Requires My24 to the Sign Network Agreements, and Repeatedly Confirms the Joint Venture and AT&T's Funding of My24's Launch at the Town Hall Meeting*

108.    After Mr. Underwood returned from Columbus Ohio, AT&T required that My24 sign a Network Integration Services and Equipment Resale Agreement, a Synaptic Agreement Hosting Service, a Content Delivery Network Agreement and a Wholesale Master Service Agreement (collectively the "Network Agreements"). By e-mail dated August 22, 2012, Ms. Pepe advised My24 that she "would like to see the agreements signed by Friday if at all possible…. We are behind in the project now and do not want to have any additional delays that could affect the site being up for the launch."

109.    AT&T, however, did not advise My24 that it had no intention of going through with the Joint Venture, *viz.*, the JV-My24 Launch; sponsoring the Town Hall Meeting; or funding My24's launch. Instead, AT&T, through Ms. Pepe, advised Mr. Underwood to the contrary. Moreover, AT&T concealed from My24 that it would fraudulently bill Mr. Underwood excessive amounts for services not owed under the Network Agreements, knowing My24 had no financial means of paying these amounts, so that AT&T could hold My24's Broadcast Platform hostage and misappropriate My24's novel ideas.

110.    By email dated August 22, 2012, Mr. Hogg advised Mr. Underwood that "[a]s [Hogg] explore[s] the possibility of whether or not AT&T would agree to any AT&T Branding for the upcoming Town Hall and/or press conference, I just wanted to confirm that you would not charge AT&T for any branding, signage or reference... Is this correct?" The branding pertained to AT&T, Inc. and its subsidiaries, collectively as AT&T.

111.     With Ms. Pepe's assurances that AT&T would continue participating in the Joint Venture, *viz.*, the JV-My24 Launch; would sponsor the Town Hall Meeting; and would fund My24's launch, on August 23, 2012, My24 signed the Network Agreements. Consistent with Mr. Olson's repeated assurances, the Network Integration Agreement provided that the intellectual property created in developing the Broadcast Platform belonged to My24.

112.     By e-mail dated August 24, 2012, Mr. Underwood responded to Mr. Hogg's August 22 e-mail, advising him that there would be commemorative holographic Town Hall Tickets bearing the AT&T/My24 logos. Mr. Underwood further stated that he would not charge AT&T for this, or for stating "this broadcasting platform is being powered by AT&T," or for signage. Mr. Underwood advised Mr. Hogg that he expected "that AT&T contribute financially to the Town Hall Meetings." Neither Mr. Hogg, nor anyone else from AT&T, advised Mr. Underwood that AT&T would not sponsor the Town Hall Meeting or would not fund My24's launch during the Town Hall meeting as AT&T had repeatedly promised.

113.     By e-mail dated August 27, 2012, Ms. Pepe continued leading Mr. Underwood to believe that AT&T would continue in the Joint Venture, *viz.*, the JV-My24 Launch; would sponsor the Town Hall Meeting; and would fund My24's launch. In her August 27 e-mail, Ms. Pepe advised Mr. Underwood that she was "sending this message to give a snapshot of where we are today with the My24HourNews.Com Project that the AT&T team has been working on for your company." Ms. Pepe further stated that "[t]he agreements for Network Integration (website), the Synoptic Hosting and Content Delivery Network were signed by you on 8/23 and the AT&T team is moving forward to implement these agreements to be ready for the implementation and testing of the website." Ms. Pepe further noted that "Todd Olson will be scheduling a meeting

with the Website Development Team, the AT&T Technical Team and your Studio Staff to validate and finalize the additional requirements for your studio." Ms. Pepe further stated:

> Scott Hogg is working on Branding with AT&T and will follow up with you later to discuss the status. We will be working with the Mobility Teams and the Uverse teams to see what type of Marketing we might be able to have set up for the Town Hall Event.
>
> Lee Culver from Uverse will be working with Todd Olson on Uverse enabled for your company. Todd and I will contact you when we are ready to discuss.
>
> I will plan a trip to Atlanta after you are in the studio location to meet with your Staff and Project team.
>
> I look forward to the Press Conference and the Presidential Town Halls that will be held in Ohio State University.

114.    Based on Ms. Pepe's August 27 e-mail, including the fact that AT&T was still interested in branding, that AT&T would still be providing him a channel on U-Verse, and that Ms. Pepe still looked forward to the Presidential Town Halls, Mr. Underwood reasonably understood that AT&T was continuing with the Joint Venture, *viz.*, the JV-My24 Launch; would sponsor the Town Hall Meeting; and would fund My24's launch.

115.    Meanwhile, during the first two weeks of September 2012, Mr. Posner continued inquiring of Mr. Underwood as to when AT&T would be funding My24. By e-mail dated September 6, 2012, Mr. Posner inquired of Mr. Underwood issues regarding an upcoming conference call between AT&T, My24 and Mr. Posner scheduled for September 14, 2012, and which would address advertising and promoting the Town Hall Meeting. In his September 6 e-mail, Mr. Posner asked Mr. Underwood "[d]id you get input from AT&T?" Mr. Posner was inquiring as to when AT&T would provide the funding necessary to sponsor the Town Hall Meeting. Mr. Posner further asked Mr. Underwood whether he was "ready to engage Posner?" Mr. Underwood advised Mr. Posner that My24 was still waiting for the AT&T funding.

116.     By e-mail dated September 14, 2012, Ms. Pepe arranged for the September 14, 2012 conference call regarding "Branding Discussion." Ms. Pepe, Mr. Hogg, Mr. Underwood and Mr. Posner participated in the conference call. During the call, Mr. Hogg stated that AT&T desired tents outside the Town Hall Meeting prominently displaying AT&T's logo. Mr. Hogg further stated that AT&T desired its logo be prominently displayed on the stage. Mr. Hogg also stated that AT&T desired advertising stating that the event was sponsored by AT&T. Additionally, Mr. Hogg also stated that he wanted AT&T to pass out T-shirts, displaying AT&T's logo. Mr. Posner, in turn, discussed how he would advertise the Town Hall Meeting on TV, radio and newspapers. Mr. Posner also discussed branding for My24.

117.     Also during the September 14 conference call, the participants discussed how much money would be required to advertise and promote the Town Hall Meeting. Mr. Underwood advised Ms. Pepe and Mr. Hogg that he estimated expenses, including advertising expenses, to be approximately $8 million. Mr. Posner advised the participants that advertising expenses would be approximately $3 million to $4 million. The remaining $4 million to $5 million in expenses would be for, among other things, producing the Town Hall Meeting, security, hiring talent, and payment to Ohio State University. Ms. Pepe stated that AT&T would get My24 the funding. Mr. Posner stated that his company needed the money "sooner than later." Ms. Pepe advised Mr. Posner that she needed a couple of weeks to go through the appropriate channels, that AT&T was committed to the Town Hall Meeting, that the AT&T funding was assured, and that she would get back to him.

118.     October 10 and 11, 2012, My24 and AT&T participated in a two-day strategy meeting in Atlanta to solidify a launch date for the Town Hall Meeting and to further assess My24's technical and financial requirements for the launch. The attendees of this meeting

included Ms. Pepe, Mr. Hogg, Mr. Olson, Mr. Underwood, and Mr. Culver. Ms. Pepe expressed

AT&T's desire to place a My24 neon graphic sign outside the building which would prominently

state that "This Broadcasting Platform Is Being Powered by AT&T." Ms. Pepe again assured Mr.

Underwood that AT&T would fund the Town Hall Meeting and provide everything necessary to

launch My24.

119.    On October 13, 2012, My24's studio experienced foundation problems and water

damage. Mr. Underwood advised Ms. Pepe of these issues that day, and Ms. Pepe advised Mr.

Underwood that AT&T would provide a studio *via* an AT&T satellite truck from which My24

could operate in connection with the launch during the Town Hall Meeting.

120.    By e-mail dated October 29, 2012, Ms. Pepe canceled the order for the T1s and

associated facilities used to connect My24's studio to the Broadcast Platform. Ms. Pepe was

informed by an internal AT&T e-mail dated October 30, 2012, that AT&T would assess

cancellation charges to My24 in the amount of $1356 because AT&T had "already completed

some dates prior to circuits' installation." As noted above, Mr. Underwood advised Ms. Pepe of

the damaged studio on October 13, 2012. Consequently, Ms. Pepe should have immediately

canceled the T1s to avoid any cancellation charges.

121.    After My24's studio experienced foundation problems and water damage, My24

began looking for another suitable studio. The Director of Technology Development, Metro

Atlanta Chamber of Commerce, introduced Mr. Underwood to Ms. Gail Glass and Mr. Jeremy

Coppels, representatives of Boxer Properties, a company that owned the Hurt building in Atlanta,

Georgia, a possible studio location.

122.    Mr. Underwood negotiated with Ms. Glass and Mr. Coppels regarding My24 possibly leasing 15,000 sq. ft. in the Hurt building. Before Ms. Glass and Mr. Coppels would agree to consider leasing this space to My24, they required My24 to establish AT&T's financial involvement in My24's operations. Thus, on November 16, 2012, Mr. Underwood, Ms. Pepe, Ms. Glass and Mr. Coppels participated in a conference call so that My24 and AT&T could convince Ms. Glass and Mr. Coppels of AT&T's financial backing of My24. During the conference call, Ms. Pepe represented to Ms. Glass and Mr. Coppels that AT&T and My24 were partners. Ms. Pepe further advised Ms. Glass and Mr. Coppels that AT&T was helping My24 with the technical components of the launch, and that AT&T was financially supporting the launch.

123.    Based on Ms. Pepe's representations regarding AT&T's technical and financial support of My24, Mr. Underwood, Ms. Glass and Mr. Coppels negotiated the lease terms, including a 15,000 monthly payment with the first five months' rent free. Moreover, Ms. Pepe had requested that the My24 studio resemble a Today Show-like atmosphere whereby viewers on the street could watch My24's live broadcasts. Ms. Glass and Mr. Coppels agreed to provide My24 with over $100,000 in building concessions to create such a studio design.

124.    While Mr. Underwood was waiting on AT&T's funding and the build out of the My24's studio at the Hurt building, Ms. Pepe's suggested that My24 locate a temporary studio from which to broadcast. Mr. Olson referred Mr. Underwood to Mr. Dirk Freeman, who owned a broadcast studio in Denver, Colorado. Mr. Underwood met with Mr. Freeman, who informed Mr. Underwood that he could provide the studio and the necessary talent and producers My24 required for My24 to launch. Mr. Underwood agreed to temporarily locate My24 at Mr. Freeman's studio facility.

*Because There Was No Longer Time to Launch My24 During a Presidential Town Hall Meeting, Ms. Pepe Requests That My24 Launch During a Presidential Interview*

125.    By mid-November, it was clear that it was too late to launch My24 during a Presidential Town Hall Meeting. Ms. Pepe nevertheless tirelessly continued working with Mr. Underwood, urging him to launch My24 during a presidential interview. Ms. Pepe assured Mr. Underwood that this launch would be pursuant to the Joint Venture, *viz.*, the JV-My24 Launch, and that AT&T would sponsor the event and fund the launch.

126.    By e-mail dated November 20, 2012, Ms. Pepe arranged a conference call with Mr. Underwood and numerous AT&T personnel. The subject matter of the e-mail was "new information for My24 that needs to be discussed." In her e-mail, Ms. Pepe advised the addressees "[p]lease attend as we have a new location and an interim for the studio."

*AT&T Breaches the Joint Venture, viz., the JV-My24 Launch; Refuses to Fund My24's Launch; and Demands That My24 pay AT&T Erroneous Invoices*

127.    AT&T never funded the launch of My24 as promised. Instead, on December 7, 2012, AT&T provided My24 an invoice in the amount of $222,750 for developing the Broadcast Platform. The work performed by AT&T in developing the Broadcast Platform was completed pursuant to the Joint Venture Agreement between AT&T and My24 well before My24 signed the Network Integration Services Agreement. Moreover, pursuant to the agreed upon Joint Venture, *viz.*, the JV-My24 Launch, AT&T had promised My24 that it would pay for the development of the Broadcast Platform, as well as all other expenses associated with the launch of My24.

128.    After receiving AT&T's $222,750 invoice, and after AT&T breached the Joint Venture Agreement, Mr. Underwood reached out to various AT&T board members, Vice Presidents and the CEO of AT&T hoping they would assist My24 in resolving the dispute. Mr. Underwood's pleas, however, fell on deaf ears.

129.     Meanwhile, AT&T knowingly continued to bill My24 charges that My24 did not

owe so that AT&T could hold My24's Broadcast Platform hostage and misappropriate My24's

novel ideas, *viz.*, live digital video news content, Movies, Sports, Animation, and other My24

Brands, delivered to Smartphones and customizable digital technology according to customer

preference, and E.R.I.C.A. My24 provided these novel ideas to AT&T pursuant to the NDA and

the Joint Venture.

130.     By e-mail dated March 26, 2013, Nicholas Moore provided Mr. Underwood (and

copied, *inter alia*, Ms. Dalton and Ms. Pepe) the following breakdown of payments allegedly due

and owing:

- 8310003743996 [Network Integration Services Agreement] - $228,652.88
- 800293234954 [Content Delivery Network Agreement] - $51,121.74
- 76384 [Synoptic Hosting Agreement] - $22,948.74
- 8340003678453 [ACDN Professional Services invoice November 12, 2012] $515

131.     In March 2013, AT&T also provided My24, for the first time, an invoice dated

November 1, 2012, for Account No. 800293234954, in the amount of $11,539.72. These charges

are cancellation charges associated with 4 T1 circuits. AT&T's charges under the Content

Delivery Network Agreement, which apparently are cancellation charges associated with the 4

T1 circuits, increased from $11,539.72 on November 1, 2012 to $51,121.74 on March 26, 2013.

These amounts increased even though My24 never launched and, as set forth in ¶109, *supra*, Ms.

Pepe canceled the T1s on October 29, 2012. And as set forth in ¶109, to avoid any cancellation

charges, Ms. Pepe should have immediately canceled the T1s on October 13, 2012, when Mr.

Underwood first advised her of the problem with the building housing My24's studio. My24 also

does not know why AT&T assessed the $515 charges for ACDN Professional Services if only cancellation charges purportedly applied.

132.    By e-mail dated July 11, 2013, AT&T advised Mr. Underwood that the "Web Hosting account 76384 is reflecting a past due balance of $118,718.12 after the service was disconnected." As set forth in ¶119, *supra*, as of March 26, 2013, this account showed a balance allegedly due and owing in the amount of $22,948.74. My24 does not know why the amount purportedly owed under this account increased by $95,769.38, particularly when My24 never launched.

133.    By e-mail dated December 3, 2013, Ms. Nancy Dalton, Ms. Pepe's supervisor, advised Mr. Underwood that AT&T could not support the establishment of service for My24HourNews due to the outstanding balances which AT&T had referred to Moye White LLP, a law firm in Denver, Colorado, for collection.

### *My24 Communicates Extensively with Moye White for Approximately One Year in an Effort to Resolve the Erroneous Invoices and AT&T's Breach of the Joint Ventures*

134.    Mr. Underwood extensively communicated with Mr. Paul Franke, an attorney with Moye White, from December 2013 through October 2014 in effort to resolve the disputed invoices and AT&T's breach of the Joint Ventures. At Mr. Franke's request, Mr. Underwood provided Mr. Franke with numerous documents relating to the AT&T/My24 Joint Venture. Mr. Franke advised Mr. Underwood that AT&T never agreed to a Joint Venture with My24. Mr. Franke also insisted that My24 owed AT&T over $575,000. Mr. Franke never explained to Mr. Underwood the disputed charges under the various accounts, despite repeated requests by Mr. Underwood that he do so.

***My24 Misses Out on a Business Opportunity with Comcast Because AT&T Holds My24's Broadcast Platform Hostage***

135.    In April 2014, while AT&T was holding My24's Broadcast Platform hostage and improperly insisting that it pay AT&T in excess of $575,000, My24 missed out on an opportunity to broadcast its live digital video news content over the facilities of Comcast Corp. ("Comcast"), a nationwide cable television company that offers cable programming to its subscribers. Although Comcast executives expressed much interest in My24's novel ideas, Comcast advised My24 that it could not decide the issue until it witnessed My24's launch. My24, however, could not launch while AT&T held its Broadcast Platform hostage.

***AT&T Issues a Press Release Stating that it Proposes to Merge with DirecTV, and Reveals that the Service to be Offered Under the Merger are the Same as My24's B****roadcast Platform Under the Joint Venture*

136.    On May 18, 2014, AT&T announced that it proposed to merge with DirecTV. In various press releases and other documents, AT&T explained the proposed merger and its benefits, stating, *inter alia*:

- "This is a unique opportunity that will redefine the video entertainment industry and create a company able to offer new bundles and deliver content to consumers across multiple screens – mobile devices, TVs, laptops, cars and even airplanes..." (Randall Stephenson, AT&T Chairman and CEO.  AT&T – Press Release May 18, 2012 (From AT&T Website)).

- "One basic consumer preference is shaping the communications marketplace: demand for integrated video/broadband services and the new generation of emerging offerings they deliver.  This transaction enables the combined companies to meet that demand and allow consumers to choose when, where and how they experience video far better than either can separately." (Randall Stephenson – Congressional Testimony – June, 24, 2014).

- "The expectation now exists that they ought to be able to have a content, enjoy that content, watch that content on whatever device they may choose. And so whether it is a smart phone or whether it is a tablet or a laptop, that content needs to be delivered there. We think we're going to be in a unique position to do that." (Randall Stephenson Quote from JP Morgan Conference Call Transcript/ May 18th, 2015).

137.    In describing the services to be offered under the proposed merger between AT&T and DirecTV, AT&T revealed that the service to be offered under the merger are the same as My24's Broadcast Platform under the Joint Venture. Put simply, AT&T tacitly conceded that it had misappropriated My24's novel ideas, its Broadcast Platform, and the intellectual property associated with the Broadcast Platform.

138.    Based on AT&T's statements regarding its proposed merger with DirecTV, it became clear that AT&T had intended all along to steal My24's novel idea to deliver live video news and digital content such as Movies, Sports, Animation, to Smartphones and Tablets in accordance with customer preference; to steal My24's broadcast platform and intellectual property; to fraudulently induce My24 into signing the various agreements; to hold My24's broadcast platform hostage by charging My24 excessive and improper amounts under the agreements knowing that My24 could not pay these amounts; and to breach the Joint Ventures.

### *While AT&T Continues to Hold My24's Broadcast Platform Hostage, My24 Continues to Miss Out on Valuable Business Opportunities*

139.    In June 2014, Mr. Freeman presented an opportunity for My24 to broadcast a cable version of My24 in the greater Denver area. My24, however, missed out on this business opportunity because AT&T continued to hold My24's Broadcast Platform hostage.

### *To Cover-Up AT&T's Misdeeds, Ms. Pepe Denies that AT&T Ever Developed the Broadcast Platform, and AT&T Refuses to Continue Communicating with My24*

140.    In a series of emails, Mr. Underwood warned Mr. Franke that by holding My24's Broadcast Platform hostage, by breaching the Joint Venture Agreements, and by improperly charging My24 in excess of $575,000, AT&T was causing My24 to incur significant damages. For example, by email dated July 22, 2014, Mr. Underwood advised Mr. Franke, among other things, that, AT&T was improperly charging My24 more than $500,000, and pointed out that,

"I'm the very first African-American who is launching a mainstream transformative news network; which will be celebrated in this country. Instead of AT&T recognizing this great achievement that is a benefit to all, my company has been made to suffer.".

141.     In September 2014, the Joint Venture and collection matters escalated to Mr. Andrew Stein, an AT&T in-house attorney. Mr. Underwood explained to Mr. Stein in detail the Joint Ventures between AT&T and My24, AT&T's development of the Broadcast Platform, and why My24 did not owe AT&T in excess of $575,000.

142.     By e-mail dated October 14, 2014, Mr. Stein advised Mr. Underwood "although I have spoken with Nancy Dalton and Barbara Pepe, neither they nor I are aware of any commitment by AT&T to update, refresh or develop the My24HourNews platform." Incredibly, both Ms. Pepe and her supervisor, Ms. Dalton, represented that they not were aware of any commitment by AT&T to develop the Broadcast Platform, even though both were deeply entrenched in coordinating the development of the Broadcast Platform, the Joint Ventures between AT&T and My24, and the launch of My24 at the Town Hall Meeting.

143.     By e-mail dated October 14, 2014, Mr. Underwood provided Mr. Stein with the statement of work pertaining to the development of My24's Broadcast Platform.

144.     By e-mail dated October 23, 2014, Mr. Stein requested the schedules of Mr. Olson and Mr. Underwood so that he could arrange a conference call for the following week. Mr. Stein, however, noted that his primary role was to resolve the unpaid charges and that he was not in a position to suggest that if such a resolution clears My24's credit standing with AT&T it would lead to a business deal.

145.     By e-mail dated October 24, 2014, Mr. Underwood provided his schedule for the following week to Mr. Stein to facilitate Mr. Stein's scheduling of the conference call.

146.     Despite numerous follow-up e-mails from Mr. Underwood to Mr. Stein over the next several weeks regarding the scheduling of the conference call, Mr. Stein never again communicated back to Mr. Underwood.

### FIRST CLAIM FOR RELIEF
### (Breach of Joint Venture Agreement – The JV - My24 Launch)

147.     My24 repeats and realleges Paragraphs 1 to 146 as though fully set forth herein.

148.     My24 and AT&T agreed to enter into a joint venture, *viz.*, the JV-My24 Launch, whereby AT&T and My24 agreed to combine their property and labor, whereby AT&T agreed to build My24's Broadcast Platform and to fund My24's launch, and My24 agreed to launch My24 in a Presidential Town Hall Meeting or a debate between President Obama and Governor Romney during the then upcoming 2012 U.S. Presidential election. Pursuant to this joint venture, AT&T agreed to sponsor My24's launch during the Town Hall meeting or debate.

149.     AT&T and My24 entered into the joint venture as a joint undertaking for profit. Pursuant to the joint venture, My24 would receive substantial advertising revenues and substantial and lucrative brand recognition. AT&T would receive lucrative cross marketing and co-branding rights which, among other things, would increase its NPS.

150.     Pursuant to the joint venture, My24 and AT&T had the joint right of control as to the launch of My24, including the details involved in launching My24 in a Presidential Town Hall Meeting or a debate between President Obama and Governor Romney during the upcoming 2012 U.S. Presidential election.

151.   AT&T breached the joint venture by refusing to fund My24's launch, refusing to sponsor the Presidential Town Hall Meeting or a debate between President Obama and Governor Romney during the upcoming 2012 U.S. Presidential election, and holding My24's Broadcast Platform hostage and demanding that My24 pay AT&T charges that are not due and owing.

152.   My24 fully performed all of its duties under the joint venture.

153.   AT&T's breach of the joint venture caused My24 to incur damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duty – The JV – My24 Launch)

154.   My24 repeats and realleges Paragraphs 1 to 146 as though fully set forth herein.

155.   As a joint venture pursuant to the JV-My24 Launch, AT&T owed to My24 a fiduciary duty of loyalty and fair, open, and honest disclosure. AT&T owed My24 the duty to cooperate with My24 and to exercise reasonable care and skill to effectuate the purposes for which AT&T and My24 had joined, and the duty not to disrupt or abandon the venture for the purpose of obtaining benefits for itself and not to do any act which obstructs the carrying on of its business to a successful conclusion.

156.   AT&T breached its fiduciary duties owed to My24 by, among other things, continuing to misrepresent to My24 that it would fund the development of My24's Broadcast Platform, continuing to misrepresent that it would fund My24's launch, abandoning the joint venture for the purpose of obtaining benefits for itself, inducing My24 to sign agreements while simultaneously misrepresenting to My24 that it would fund My24's launch, misappropriating My24's ideas, and continuing to hold My24's Broadcast Platform hostage while demanding that My24 pay AT&T charges that are not due and owing.

157.    AT&T's breach of fiduciary duties owed to My24 has caused My24 to incur damages in an amount to be proven at trial.

158.    AT&T's breach of fiduciary duties was willful and wanton entitling My24 to punitive damages.

### THIRD CLAIM FOR RELIEF
### (Promissory Estoppel – The My24 Launch)

159.    My24 repeats and realleges Paragraphs 1 to 146 as though fully set forth herein.

160.    My24 pleads, in the alternative, that AT&T promised My24 that it would build My24's Broadcast Platform, fund My24's launch, and sponsor My24's launch during the Presidential Town Hall Meeting or a debate between President Obama and Governor Romney during the upcoming 2012 U.S. Presidential election.

161.    AT&T should have reasonably expected My24 to rely on these promises.

162.    My24 did, in fact, rely on AT&T's promises to its detriment.

163.    Injustice can be avoided only by the enforcement of the promise, because My24 surrendered the valuable right of developing its Broadcast Platform through another common carrier which would have allowed it to launch back in 2011 and become a highly profitable multi-media company which would have competed directly with AT&T in the multi-media marketplace.

### FOURTH CLAIM FOR RELIEF
### (Breach of Joint Venture Agreement – The JV-My24 Multimedia Expansion)

164.    My24 repeats and realleges Paragraphs 1 to 146 as though fully set forth herein.

165.    My24 and AT&T agreed to enter into a joint venture, *viz*., The JV-My24 Multimedia Expansion, whereby AT&T and My24 agreed to combine their property and labor, whereby AT&T agreed to invest $102,000,000 in My24 to finance My24's operations, and whereby AT&T, in turn, would receive long term co-marketing, co-branding, and data charges to customers for consumption of My24's digital content.

166.    AT&T and My24 entered into the joint venture as a joint undertaking for profit. Pursuant to this joint venture, My24 would receive, after the first joint venture, *viz*., the My24 Launch, AT&T's $102,000,000 financial investment allowing My24 to expand its digital content offering into, *e.g*., sports, animation, and movies. This expansion was important and beneficial to AT&T as it would allow AT&T to assess its customers substantial premium data charges for the use of such digital content on its network. Additionally, this joint venture would incorporate E.R.I.C.A., which in and of itself would generate billions of dollars in data charges over the course of this joint venture. Finally, through this joint venture, AT&T would greatly increase its NPS.

167.    Pursuant to the joint venture, My24 and AT&T had the joint right of control as to My24's content distribution, as AT&T was to be the exclusive provider of My24's digital content delivered through My24's Broadcast Platform.

168.    AT&T breached the joint venture by refusing to make the $102,000,000 financial contribution after it had already breached the first Joint Venture, *viz*., the My24 Launch. AT&T further breached the joint venture by holding My24's Broadcast Platform hostage while demanding that My24 pay charges not due and owing so that AT&T could instead merge with DirecTV and provide the same service offering to its customers that it had agreed to provide through My24.

169.     My24 fully performed all of its duties under the joint venture.

170.     AT&T's breach of the joint venture has caused My24 to incur damages in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty – Joint Venture Agreement - The JV-My24 Multimedia Expansion)

171.     My24 repeats and realleges Paragraphs 1 to 146 as though fully set forth herein.

172.     As a joint venture pursuant to the JV-My24 Multimedia Expansion, AT&T owed to My24 a fiduciary duty of loyalty and fair, open, and honest disclosure. AT&T owed My24 the duty to cooperate with My24 and to exercise reasonable care and skill to effectuate the purposes for which AT&T and My24 had joined, and the duty not to disrupt or abandon the venture for the purpose of obtaining benefits for itself and not to do any act which obstructs the carrying on of its business to a successful conclusion.

173.     AT&T breached its fiduciary duties owed to My24 by, among other things, refusing to make the $102,000,000 financial investment after it had already breached the first Joint Venture, *viz*., the My24 Launch. AT&T further breached the joint venture by holding My24's Broadcast Platform hostage while demanding that My24 pay charges not due and owing so that AT&T could instead merge with DirecTV and provide the same service offering to its customers that it had agreed to provide through My24.

174.     AT&T's breach of fiduciary duties owed to My24 caused My24 to incur damages in an amount to be proven at trial.

175.     AT&T's breach of fiduciary duties was willful and wanton entitling My24 to punitive damages.

## SIXTH CLAIM FOR RELIEF
### (Promissory Estoppel – The My24 Multi-Media Expansion)

176.    My24 repeats and realleges Paragraphs 1 to 146 as though fully set forth herein.

177.    My 24 pleads, in the alternative, that AT&T promised to pay My24 $102,000,000 to finance My24's operations.

178.    AT&T should have reasonably expected My24 to rely on these promises for numerous reasons. First, AT&T knew that at the time it made the promise to My24, AT&T had already virtually completed the Broadcast Platform. Second, AT&T had represented to My24 that this expansion was important to AT&T as it would allow AT&T to assess its customers substantial premium data charges for the use of such digital content. Third, AT&T had represented to My24 that E.R.I.C.A. would generate billions of dollars in data charges for AT&T. Fourth, AT&T had represented to My24 that AT&T would greatly increase its NPS. Finally, AT&T knew that My24 was a start-up company dependent upon AT&T's financial backing to launch My24.

179.    My24 did, in fact, rely on AT&T's promises to its detriment.

180.    Injustice can be avoided only by the enforcement of the promise, because My24 surrendered the valuable right of obtaining financing and distribution facilities through another common carrier and become a highly profitable multi-media company which would have competed directly with AT&T in the multi-media marketplace.

## SEVENTH CLAIM FOR RELIEF
### (Fraudulent Misrepresentation/Inducement)

181.    My24 repeats and realleges Paragraphs 1 to 146 as though fully set forth herein.

182.    AT&T made false representations to My24 to induce My24 into choosing AT&T to develop the My24 Broadcast Platform and to exclusively provide the Content Delivery Network, and to induce My24 into signing the Network Agreements, including misrepresenting to My24 that it would fund the development of My24's Broadcast Platform, misrepresenting to My24 that it would fund My24's launch, misrepresenting to My24 that it would financially invest $102,000,000 on the pretense that My24 could then expand its digital content offering into, *e.g.*, sports, animation, and movies, and misrepresenting that it would abide by the terms of the NDA. AT&T further misrepresented to My24 that AT&T would exclusively provide the Content Delivery Network and that My24's expansion was important to AT&T as it would provide AT&T lucrative co-branding and co-marketing opportunities, allow AT&T to assess its customers substantial premium data charges for the use of the digital content generated from My24's Broadcast Platform, thereby allowing AT&T to substantially increase its NPS.

183.    AT&T knew that the representations were false at the time it made them to My24, and when AT&T made these promises it had a present intent not to perform these promises.

184.    AT&T intended to deceive My24.

185.    My24 justifiably relied on the representations by exclusively using AT&T to develop the Broadcast Platform and to exclusively provide the Content Delivery Network.

186.    As a proximate result of its reliance, My24 has suffered damages in an amount to proven at trial.

187.    AT&T's fraudulent misrepresentations and inducement were made willfully and wantonly entitling My24 to punitive damages.

## EIGHTH CLAIM FOR RELIEF
### (Fraudulent Concealment/Inducement)

188.    My24 repeats and realleges Paragraphs 1 to 146 as though fully set forth herein.

189.    AT&T concealed material facts from My24, including that it had no intention of going through with the Joint Venture –The JV-My24 Launch; that it had no intention of going through with the Joint Venture – The JV-My24 Multi-Media Expansion; that it had no intention of sponsoring the Town Hall Meeting; that it had no intention of funding My24's launch; that it would fraudulently bill My24 excessive amounts for services not owed under the Network Agreements; that it would hold hostage My24's Broadcast Platform so that AT&T could misappropriate My24's novel idea and, through its merger with DirecTV, provide the services intended to be provided off the My24 Broadcast Platform.

190.    AT&T's concealment was intended to induce My24 into choosing AT&T to develop the Broadcast Platform and to exclusively provide the Content Delivery Network, and to induce My24 into signing the Network Agreements.

191.    AT&T acted in a deceiving or misleading manner;

192.    My24 relied on AT&T's concealment by exclusively selecting AT&T to develop the Broadcast Platform and to exclusively provide the Content Delivery Network, by foregoing the opportunity to contract with another carrier to develop the Broadcast Platform and to provide My24's Content Delivery Network services, and by foregoing the opportunity to obtain alternative financing.

193.    As a proximate result of AT&T's concealment, My24 has suffered damages in an amount to be proven at trial.

194.    AT&T's fraudulent concealment was made willfully and wantonly entitling My24 to punitive damages.

## NINTH CLAIM FOR RELIEF
### (Breach of Contract - NDA)

195.    My24 repeats and realleges Paragraphs 1 to 146 as though fully set forth herein.

196.    AT&T and My24 entered into the NDA.

197.    Under the terms of NDA, AT&T and My24 agreed that "Confidential Information" included, *inter alia*, pricing and financial data, network designs and design proposals, analyses, proposals, business plans, forecasts, plans and specifications of any product or service, drawings, models, software, and prototypes.

198.    On information and belief, AT&T breached the NDA by disclosing to DirecTV, and to the public generally, vital elements of My24's Business Plan and novel ideas associated with the Broadcast Platform. These elements and novel ideas constitute "Confidential Information" under the NDA.

199.    My24 has performed all of its obligations under the NDA.

200.    AT&T's breach of NDA has caused My24 to incur damages in an amount to be proven at trial.

## TENTH CLAIM FOR RELIEF
### (Idea Misappropriation)

201.    My24 repeats and realleges Paragraphs 1 to 146 as though fully set forth herein.

202.    My24's idea, *viz.*, the Broadcast Platform and the technology associated therewith, including the backend specifications, is novel.

203.    My24's disclosed its idea, *viz.*, the Broadcast Platform and the technology associated therewith, including the backend specifications, to AT&T in confidence.

204.    On information and belief, AT&T adopted My24's idea and will be making use of the idea through the services it will provide in connection with its merger with DirecTV.

205.    My24's idea is sufficiently concrete in its development to be usable, as AT&T developed the Broadcast Platform.

206.    As a proximate result of AT&T's misappropriation of My24's idea, My24 has suffered damages in an amount to be proven at trial.

207.    AT&T's idea misappropriation was done willfully and wantonly entitling My24 to punitive damages.

### ELEVENTH CLAIM FOR RELIEF
### (Theft of Trade Secrets)

208.    My24 repeats and realleges Paragraphs 1 to 146 as though fully set forth herein.

209.    My24's technology associated with the Broadcast Platform, including the backend specifications, constitute trade secrets.

210.    My24 disclosed these trade secrets to AT&T in confidence.

211.    On information and belief, AT&T has used My24's trade secrets and will be using My24's trade secrets through the services it will provide in connection with its merger with DirecTV.

212.    AT&T's use of My24's trade secrets constitutes a breach of confidence reposed in AT&T by MY24 in disclosing the secret to AT&T.

213.     As a proximate result of AT&T's use of My24's trade secrets, My24 has suffered damages in an amount to be proven at trial.

214.     AT&T's theft of trade secrets was done willfully and wantonly entitling My24 to punitive damages.

## TWELFTH CLAIM FOR RELIEF
### (Unjust Enrichment)

215.     My24 repeats and realleges Paragraphs 1 to 146 as though fully set forth herein.

216.     AT&T has retained My24's Broadcast Platform and intellectual property associated therewith.

217.     AT&T has been unjustly enriched as a result of its unjust retention of My24's Broadcast Platform and intellectual property associated therewith.

218.     As a proximate result of AT&T's unjust enrichment, My24 has suffered damages in an amount to be proven at trial.

## THIRTEENTH CLAIM FOR RELIEF
### (Conversion)

219.     My24 repeats and realleges Paragraphs 1 to 146 as though fully set forth herein.

220.     My24 had the right of possession of the Broadcast Platform and intellectual property associated therewith.

221.     AT&T has actual possession of My24's Broadcast Platform and intellectual property associated therewith.

222.     My24 has demanded that AT&T return to My24 the Broadcast Platform and intellectual property associated therewith.

223.    AT&T has refused to return to My24 the Broadcast Platform and intellectual property associated therewith.

224.    As a proximate result of AT&T's conversion, My24 has suffered damages in an amount to be proven at trial.

225.    AT&T's conversion was done willfully and wantonly entitling My24 to punitive damages.

## FOURTEENTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

226.    My24 repeats and realleges Paragraphs 1 to 146 as though fully set forth herein.

227.    AT&T negligently supplied false information to My24, a person to whom AT&T would foreseeably supply such information, including (a) that it would fund the development of My24's Broadcast Platform; (b) that it would fund My24's launch; (c) that it would financially invest $102,000,000 so that My24 could then expand its digital content offering into, *e.g.*, sports, animation, and movies; (d) that it was important to AT&T that it exclusively provide the My24 Content Delivery Network, (e) that it was important to AT&T that My24 expand its multi-media content; and (f) that My24's expansion would provide AT&T lucrative co-branding and co-marketing opportunities, would allow AT&T to assess its customers substantial premium data charges for the use of the digital content generated from My24's Broadcast Platform, and would allow AT&T to substantially increase its NPS.

228.    My24 justifiably relied on the representations by exclusively using AT&T to develop the Broadcast Platform and to exclusively provide the Content Delivery Network.

229.    As a proximate result of its reliance, My24 has suffered damages in an amount to proven at trial.

230.    AT&T's negligent misrepresentations were made willfully and wantonly entitling My24 to punitive damages.

### FIFTEENTH CLAIM FOR RELIEF
### (Preliminary and Permanent Injunctive Relief)

231.    My24 repeats and realleges Paragraphs 1 to 146 as though fully set forth herein.

232.    My24 seeks preliminary and permanent injunctive relief enjoining AT&T from using, directly or indirectly, My24's novel ideas (including the use of the ideas described in My24's Business Plan and the use of My24's Multimedia Expansion), Broadcast Platform, and associated intellectual property, and requiring AT&T to return the Broadcast Platform and associated intellectual property to My24.

233.    My24 can show likelihood of success, and actual success, on the merits.

234.    My24 will suffer irreparable harm in the absence of a preliminary injunction.

235.    The balance of equities tip in My24's favor.

236.    The requested injunctive relief will serve the public interest.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff My24HourNews.Com, Inc. prays for judgment against AT&T as follows:

1.  For actual damages and consequential damages, including lost profits, according to proof at trial, plus pre-judgment interest thereon against AT&T.

2.  For costs of suit and attorneys' fees as allowed by law against AT&T.

3.  For punitive damages on Plaintiff My24HourNews.Com, Inc.'s Second, Fifth, Seventh, Eighth, Tenth, Eleventh, Thirteenth and Fourteenth Claims for Relief, in addition to actual damages, against AT&T.

4.  For preliminary and permanent injunctive relief as requested herein against AT&T.

### DEMAND FOR JURY DEMAND

My24 hereby demands a jury trial on all claims herein that are triable by jury.

Dated: July 31, 2015                    Respectfully submitted,


                                        *s/ Michael D. Murphy*
                                        Michael D. Murphy
                                        Michael L. Glaser
                                        The Law Offices of Michael L. Glaser, LLC
                                        1720 S. Bellaire St., Suite 607
                                        Denver, CO  80222
                                        Telephone: 303-757-1600
                                        Fax: 303-757-2874
                                        mmurphy@glaserlegal.com
                                        ***Attorneys for My24HourNews.Com, Inc.***

Plaintiff's Address:
My24HourNews.Com, Inc.
c/o Erik Underwood
1550 Larimer St., Suite 779
Denver, CO 80202